**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **CRIMINAL NO. 22-35-1** |
| **ANDREW WOLF** | **:** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Andrew Wolf, a former middle school teacher at Springside Chestnut Hill Academy (SCH) in Philadelphia, stands before this Court for sentencing for his convictions for manufacturing child pornography and conspiracy to manufacture child pornography, arising out of an elaborate child exploitation catfishing scheme that he developed to entice his own middle school students, among other child victims, to self -produce images of themselves engaged in sexually explicit conduct. Wolf ultimately received these images for his own sexual gratification and sometimes shared them with other sexual predators on the Internet. Wolf and his co-defendant, Kray Strange, carried out this scheme for nearly a year and a half by impersonating minor girls online to entice their boy victims. To facilitate their efforts to victimize Wolf's own students and maintain a tally of their successes, Wolf created a spreadsheet of his current, former, and soon-to-be middle school students for Strange to target, organized by photograph, name, graduation year, and known social media handles. In doing so, Wolf victimized and exploited not only several of his own students, but also the entire, close-knit school community at SCH in a calculated and malicious way.

As further discussed below, while this conduct is remarkably egregious, it represents just a portion of the defendant's ongoing victimization of children through producing, trading, and collecting child pornography. The defendant became involved in the world of child exploitation

as early as the late 1990s, even before beginning his 18-year-long career at an all-boys' middle school, where he could surround himself all day with boys in the exact age range to which he was most sexually attracted. Over the years, the defendant became entrenched in the dark world of child exploitation, developing relationships with other offenders on the platform Telegram and escalating to victimizing children on a near daily basis in the years leading up to his arrest on October 7, 2021.

The defendant's Sentencing Guideline range in this case calls for a sentence of life imprisonment; but the statutory maximum possible sentence is 240 years' (2,880 months) imprisonment, so that becomes the effective guideline range. The government seeks a life-equivalent sentence, which the defendant has earned through the egregiousness of his conduct, the scope of his child exploitation activities, and his targeting of his own students for victimization while they and their parents believed he was interested in their educational and personal success.

The government explains below its view of the proper consideration in this case of the advisory Guideline range and of the Section 3553(a) factors, which support the imposition of a life-equivalent sentence.

## I.    PROCEDURAL BACKGROUND

On October 7, 2021, Andrew Wolf was arrested and charged via a federal complaint and warrant with distribution and receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2) after the FBI executed a federal search warrant at Wolf's residence. At that time, law enforcement only was aware of Wolf uploading child pornography to his Dropbox account, which prompted Dropbox to make a Cybertipline report to the National Center for Missing and Exploited Children (NCMEC) in July 2021, and Wolf purchasing images of child pornography

online from Minor 6.  Wolf has remained in custody at the Federal Detention Center since the time of his arrest.

A search of Wolf's cell phone revealed that he was well entrenched in the online child exploitation community and was committing far more serious crimes than those initially charged in the complaint, including against his own middle school students.  The FBI identified one of his associates, Kray Strange, with whom Wolf had developed his catfishing scheme to victimize his own students.  Strange was arrested and charged via a federal complaint and warrant on January 5, 2022.

On February 3, 2022, a federal grand jury returned an eight-count indictment against defendants Wolf and Strange, charging them with conspiracy to manufacture child pornography, in violation of 18 U.S.C. § 2251(a) (Count One), and charging Wolf with seven counts of manufacture, attempted manufacture, and aiding and abetting and willfully causing the manufacture of child pornography, in violation of 18 U.S.C. §§ 2251(a) and 2 (Counts Two through Eight).

On June 23, 2022, the defendant entered an open guilty plea to all counts of the Indictment.  There is no guilty plea agreement with the government.

A sentencing hearing is scheduled for February 16, 2023.

## II.    **FACTUAL BACKGROUND**

Between May 2020 and October 7, 2021, Andrew Wolf, a teacher at Springside Chestnut Hill Academy (SCH), and Kray Strange, a young adult from Carthage, New York, operated an elaborate online child exploitation catfishing scheme to entice minor boys to self-produce sexually explicit images and send them, primarily to Strange, but sometimes to Wolf, over the Internet.  To carry out this scheme, Strange assumed the online persona of a minor teen girl

named "Alex Zampini" or "Leslie Hansen," depending on the scenario. (Strange also sometimes impersonated a minor boy when targeting boy victims he believed to be gay, but that did not happen with any of our charged victims). Strange used his minor girl persona to target boys primarily on Snapchat and enticed the boys to self-produce and send him sexually explicit images by distributing images of minor girls engaged in sexually explicit conduct, which Strange claimed were pictures and videos of Alex/Leslie, and sometimes by engaging the boys in games of "Truth or Dare." Strange also provided his victims with specific instructions about the kinds of pictures and videos he wanted, often asking Wolf for suggestions. Beginning around July 2020, Wolf and Strange began discussing Strange catfishing (or "baiting") Wolf's own minor boy students at SCH.

In early August 2020, Wolf began providing Strange with known social media handles for some of his students, and Strange also located some students on social media on his own. Ultimately, in January 2021, Wolf provided Strange with a detailed spreadsheet[1] of the students he wanted Strange to target, which greatly assisted Strange in his efforts. The spreadsheet includes 78 potential minor victims that Wolf requested Strange to target, all of whom were Wolf's current, former, or soon-to-be students, organized by photograph, name, class graduation year, and known social media handles. Using the spreadsheet, Wolf and Strange maintained a tally of their communications and successes, which included notations such as "Got him" and "Got his d," followed by exclamation points and emojis. Via Telegram, Wolf also provided Strange with specific instructions to pass along to the victims regarding the sexually explicit images he wanted his students to create. Wolf also assumed a fictitious online minor girl

---

[1] The spreadsheet speaks for itself and is attached as **Exhibit A to be filed under seal.** Through investigation, the FBI identified the Google account that Wolf used to create the document and obtained the document through a federal search warrant.

persona, "Ashley Hamilton" and, on occasion, once Strange had built a rapport with the victims and was already receiving sexually explicit images from them, Strange would introduce the victims to "Ashley" online, so that Wolf could directly join in the communication.

Wolf's conduct only came to light after the FBI investigated a CyberTip on his Dropbox account, and Wolf was arrested on a federal complaint and warrant related to that conduct on October 7, 2021. On that day, Wolf initially agreed to speak to the FBI about his conduct. When asked why Wolf thought the FBI might be interested in speaking to him, Wolf responded that it was likely because of his Dropbox account, which he reported recently was shutdown for violating Dropbox's terms of service related to pornography. Wolf further described that he had received some pornography that "looked young" from Instagram and it was uploaded to his Dropbox account. Wolf reported that he used several Instagram accounts. Other than these statements, Wolf was remarkably self-serving. At this point in time, agents were not aware of the extent of Wolf's child exploitation crimes, and even pursued a line of questioning to the effect of, "We know you're not the guy who's preying on his own students; we just want to get to the bottom of what happened with Dropbox…". Wolf adamantly agreed with their statement that he was not and would not abuse/exploit his own students or any other children, answering, "No, sir." He invoked his right to counsel, at which point the questioning ceased.

A review of Wolf's cell phone revealed his deep entrenchment in the online child exploitation world, including the development and execution of his and Strange's scheme to catfish Wolf's students. The evidence of Wolf and Strange's scheme comes primarily from the Telegram communications that were extracted from Wolf's cell phone at the time of his arrest and corroboration from victim interviews. Wolf and Strange engaged in Telegram conversations for nearly 18 months, between approximately May 2, 2020, through October 7, 2021, the date of

Wolf's arrest, and they communicated almost every day during this time. Their conversation amounts to over 4,200 pages of communications and contains over 27,000 messages, including image and video files. Of approximately 4,000 image files exchanged between Wolf and Strange, many of the files now appear as "empty" files, meaning they were deleted by one of the parties in the chat, and the content cannot be retrieved. From the approximately 500 image files exchanged between Wolf and Strange that were retrieved, about half of those— approximately 250 image files— clearly depict child pornography.

In addition to the victims charged in this Indictment, Strange and Wolf discussed other minors Strange was targeting and also shared image and video files of these minors. Among other victims, Strange sought out minor boys with large online followings, such as Little League World Series players, children of political figures, and child Tik Tok stars.

Within the Telegram communications, Wolf and Strange also discussed other associates with whom they communicated on Telegram regarding their child exploitation activities and with whom they traded child pornography. In the same way the FBI extracted the communications between Wolf and Strange from within the Telegram application on Wolf's cell phone, the FBI obtained communications between Wolf and several other perpetrators, including, among others, an individual who purports to be a youth baseball coach, a teacher and youth hockey coach,[2] and another teacher.[3] Wolf distributed child pornography of Minor 2 to one of these Telegram

---

[2] This Telegram associate, "Mr. Pickles," was identified through a lead generated out of FBI Philadelphia as Daniel Dasko, an elementary and middle school teacher and youth hockey coach in San Diego, California. Dasko has been charged in the Southern District of California. PSR ¶ 95.

[3] This Telegram associate, "Alden," was identified through a lead generated out of FBI Philadelphia as Alden Bunag, a middle and high school teacher in Hawaii. Bunag has been charged in the District of Hawaii with child pornography offenses and in the state of Hawaii with hands-on sexual offenses against a 13-year-old student. PSR ¶ 94. On or around November 10, 2019, Bunag sent Wolf
*continued . . .*

associates, and child pornography of Minors 2, 3, and 13 to another.

## III.    SENTENCING CALCULATION

### A.    Statutory Maximum Sentences

**Manufacturing/attempted manufacturing/conspiracy to manufacture child pornography, 18 U.S.C. § 2251(a)(1) (Counts One through Eight):** 30 years' imprisonment with a 15-year mandatory minimum term of imprisonment, a mandatory minimum 5 years of supervised release up to a lifetime of supervised release, a $250,000 fine, a $100 special assessment, mandatory restitution pursuant to 18 U.S.C. § 2259 of at least $3,000 per victim, and if found to be non-indigent, an additional mandatory $5,000 special assessment must be imposed pursuant to 18 U.S.C. § 3014, and up to $50,000 in additional assessments may be imposed pursuant 18 U.S.C. § 2259A, on each count.

**TOTAL MAXIMUM PENALTY**: 240 years' imprisonment with a mandatory minimum term of 15 years' imprisonment, a minimum 5 years up to a lifetime of supervised release, a $2,000,000 fine, mandatory restitution of at least $3,000 per victim, an $800 special assessment, and if found to be non-indigent, an additional, mandatory $40,000 in special assessments must be imposed pursuant to 18 U.S.C. § 3014, along with up to $400,000 in additional assessments under 18 U.S.C. § 2259A.

### B.    Sentencing Guidelines Calculation

The government agrees with the Probation Office's calculation of the defendant's advisory Sentencing Guideline range, outlined in PSR Paragraphs 102-166.

With a Criminal History Category I and final offense level of 43, the advisory Guideline range is life imprisonment, but the effective Guideline range is 2,880 months' (240 years) imprisonment, which is the statutory maximum sentence.  PSR ¶ 214.

---

videos which he described as himself having sex with the 13-year-old victim at their school, to which Wolf responded, "Dude, that's so fucking hot, love your dick, and love how he is eager to keep it inside of him hehe… remind me how old you each were at the time."  After learning that they were 28 and 13 years old, Wolf told Bunag, "Fuck you are so lucky… I just came a short while ago, but I'm already hard again.  I wanna see more!... I really need to find a 13-year-old to fuck."

**IV.      SENTENCING ANALYSIS**

A thorough consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that a life-equivalent prison sentence is warranted.

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

**A.      Consideration of the 3553(a) Factors**

1.      The nature and circumstances of the offense

The production of child pornography is undisputedly a grave offense. As the Supreme Court has explained, "[c]hild pornography harms and debases the most defenseless of our citizens. Both the State and Federal Government have sought to suppress it for many years, only to find it proliferating through the new medium of the Internet." *United States v. Williams*, 553 U.S. 285, 307 (2008). Congress, too, has explained the difficulties in successfully combating the

"immense" problem of child pornography and the "rapidly-growing market" for such materials, which is fueled by new technologies that were largely unavailable when the Sentencing Guidelines were first promulgated. *See S. Rep. No. 108-2 (2003)*. Indeed, Congress has repeatedly expressed its dismay about the "excessive leniency" of federal sentences, *see H. Rep. No. 108-66; S. Rep. No. 104-358*, especially in light of the continuing harm caused to the children appearing in such materials, as well as the inflammatory effect it has on the "desires of child molesters, pedophiles, and child pornographers," which results in a robust and growing market for child pornography and, therefore, increased abuse of innocent children. *See Child Pornography Prevention Act of 1996,* Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009-26, 27 (1996), codified at 18 U.S.C. § 2251 note; *United States v. MacEwan*, 445 F.3d 249, 250 (3d Cir. 2006); *United States v. Norris*, 159 F.3d 926, 929 (5th Cir. 1998). The Supreme Court has clearly recognized the harm to these children, noting that the "materials produced are a permanent record of the children's participation…" in the abuse. *See New York v. Ferber*, 458 U.S. 747, 759 (1982); *Osborne v. Ohio*, 495 U.S. 103, 111 (1990) ("The pornography's continued existence causes the child victims continuing harm by haunting the children for years to come.").

Here, the defendant committed these crimes while employed as a middle school teacher in a position of community trust and authority. In addition to engaging in the online world of child pornography, which repeatedly victimizes some of the most vulnerable members of society with each time these children's images of being sexually abused by adults are viewed and shared, the defendant went even further and targeted his own students for sexual exploitation. In doing so, he betrayed the trust of an entire school community. With his profession, the defendant chose to surround himself with boys in the exact age range to which he is most sexually

attracted. He chaperoned overnight school trips with these boys, volunteered to coach middle school baseball and, on a daily basis, intermingled his deviant sexual interest in pubescent boys with his profession. For years, the defendant managed to conceal his true deviant sexual interests from his students and their parents. His students viewed him as a role model. His students' parents trusted him to protect their kids and further their educational and personal development. As a teacher for 18 years, the defendant should have carried an even greater responsibility than other citizens to protect the safety and well-being of innocent children. Instead, he exploited his students and other children for his own sexual gratification.[4]

During 2020 and 2021, the defendant's school-age victims were made even more vulnerable by the Covid-19 pandemic. They were in virtual school, isolated from in-person association with most of their friends and those in their peer group. Like most of society, they were using the Internet to communicate with their friends and loved ones outside of their nuclear families. Use of the Internet to meet friends was normalized, and many of the defendant's victims believed they were communicating with a similarly aged girl who was the friend of a friend. The defendant preyed upon this vulnerability, as well as the fact that his intended victims were young teenage boys going through puberty who would respond to positive attention from an attractive girl their same age. To Wolf, boys in this age group were the perfect victims, as he described in graphic detail to one of his Telegram associates: "Kids… just getting their pubes

---

[4] The government expects some of the victims' parents to attend the sentencing hearing, at which time they may choose to address the Court and provide victim impact testimony. The government has also received some written victim impact statements, attached here as **Exhibit B to be filed under seal.** Should the government receive additional written statements in advance of the sentencing hearing, they will be forwarded to the Court and counsel to be included as part of Exhibit B.

and cumming for the first time this year, voices cracking, perfectly entering puberty."[5]

When boys resisted the initial online contact by Wolf and Strange by not responding at all or by cutting off communication when things turned sexual, Wolf persisted by encouraging Strange to resume communication with the boys after some downtime, encouraging him to reach out as "Leslie" rather than "Alex" or vice-versa. For example, on June 30, 2021, while discussing one of their victims becoming "more adventurous" over time, Wolf commented, "Apparently you need to keep trying my boys every so often." When boys who were already sending sexually explicit images of themselves hesitated or declined to send more images, Wolf sometimes encouraged Strange to threaten to "leak" the boy's images to coerce him into sending more. For example, in response to Strange telling Wolf that Minor 3 had blocked him and, as a result, Strange was deciding whether he should leak Minor 3's images to his friends or just try again as another girl persona, Wolf responded, "He decided to take the risk. I guess wait until you are out of options and then maybe leak." On another occasion, Wolf told Strange, "Ur extortion makes me so hard dude."

Wolf also encouraged the escalation of the sexually explicit conduct in which he and Strange coerced their victims to engage. For example, Wolf and Strange enticed two victims to record themselves engaging in sexual conduct with each other. Wolf went so far as to attempt to persuade one minor victim to sexually abuse his 10-year-old brother in his sleep.

While the defendant's victimization of his own students is the most egregious aspect of his conduct, those crimes and the others charged in the Indictment only scratch the surface of the defendant's involvement in the child exploitation world. The defendant also exploited hundreds

---

[5] *See* attached **Exhibit C, to be filed under seal,** for a selection of Telegram chats between Wolf (operating the Telegram username "Mr. P") and others. This selection includes the chats referenced in this memorandum that were not part of the change of plea memorandum.

of other children on the internet with his co-defendant, with other sexual predators in his online community, and on his own.  The defendant traded child pornography with other offenders on the platform Telegram starting at least as early as March of 2018 and did so on a near daily basis until the time of his federal arrest, often spending most of the night communicating with his Telegram associates rather than sleeping or doing anything else productive.  The defendant's Telegram associates included at least two other schoolteachers, a youth hockey coach, and a youth baseball coach, among others, all of whom shared Wolf's deviant sexual interests in middle school boys, including their own students and players.  The communications between Wolf and these associates (in addition to his communications with Strange) recovered by the FBI amount to **more than 15,000 messages exchanged between March 2018 and the time of Wolf's arrest,** almost exclusively regarding their shared sexual interest in children, their trading of child pornography, and their enticement of boys to produce child pornography.

Long before creating his spreadsheet to facilitate Strange's catfishing efforts and make the victimization of his own students into some kind of sick game, Wolf discussed his sexual attraction to his students with other Telegram associates.  He began by circulating school photos and other non-pornographic photos of some students, some of which he obtained from the school's website and some of which he surreptitiously took himself in his classroom and on school trips.  For example, in November 2019, Wolf told one of his Telegram associates, "I've been looking more and more at younger boys the past month or two.  Been scouting out the 5th graders in my school the last week or two… their school pics just came out last week!  And then I went searching for old photos of them on our private website… And found some."  Later, Wolf told the same associate, "Would love to see my 8th graders fuck our 5th graders," and proceeded to pair off eighth and fifth grade boys by name.

In addition to Telegram, Wolf had several other accounts with applications used primarily, if not exclusively, for obtaining, trading, and storing child exploitation material, and he often freely discussed these other platforms with his Telegram associates. On most of these platforms, Wolf used his minor teenage girl persona "Ashley" to identify himself, including on TikTok, Twitch, Snapchat, Kik, Google, and Discord. With his Telegram associates, Wolf discussed Mega NZ and often recommended the dark website "Boystown" as a place to find the best sexually explicit images of middle school age boys. Wolf also frequently discussed his own short stories depicting the sexual abuse and rape of young boys that he self-published on the website Nifty.

With Strange and other Telegram associates, the defendant participated in "baiting" or catfishing other boys to produce child pornography for the offenders' sexual gratification. In addition to his own students, the defendant had a particular fascination with targeting boys who were talented athletes, especially those involved in the Little League World Series. Wolf also strategized with Strange and other Telegram associates about the best ways to successfully "bait" young boys online. On August 20, 2020, for example, Wolf suggested to Strange: "We could run a kik group together for gay boys 12-15. Might be fun. If ur in charge of group u can require them to send u live photo to stay in group." To further their efforts, Wolf sometimes took time off from baiting and trading boys' images to seek out "new" sexually explicit images of minor girls that he could redistribute as "Ashley," creating yet another set of child victims in this case— the young girls that Wolf revictimized by downloading and distributing the images of their abuse on the Internet.

2. The history and characteristics of the defendant

The defendant has been involved in the sordid world of child pornography since the late

1990s when he began collecting sexually explicit images of young boys, as evidenced by CDs recovered from his residence during the federal search warrant. These CDs contained images of child erotica and child pornography with image creation dates ranging from July 1997 to July 2004. *See* Exhibit D. After entering this world, the defendant sought out employment as a middle school teacher at an all-boys' school, where he would surround himself with the exact population of children to whom he was most sexually attracted on a daily basis for 18 years until the time of his arrest in October 2021. During this time, Wolf gained extra access to minors by volunteering to coach middle school baseball, chaperoning overnight school trips and other field trips, and running activities for fifth grade students after school.

The defendant's employment history is completely intertwined with his crimes and should be considered an aggravating factor at sentencing. He had a special duty to serve and protect children and, instead, chose to make his own students his victims. The defendant began distributing school photographs of students and discussing his sexual fantasies about them with other sexual predators online as early as 2019. For example, on January 6, 2020, Wolf sent a Telegram associate photos of boys whom he described as third and fourth graders "worth raping." While teaching virtual classes during the height of the Covid-19 pandemic, Wolf told his Telegram associates about giving his students assignments to make videos of themselves, which he then distributed on Telegram; he discussed recording his Zoom classes because he found it arousing to see boys in their own bedrooms; he coordinated a one-on-one zoom meeting with a student at 9:00 p.m., which made Wolf feel "very naughty" because he was not supposed to meet with students after 5:00, but it was "fun to watch [his] students in general, especially in the room where they jack off." On November 12, 2020, Wolf told Strange, "Got really horny during class today. They were taking a test and I turned my camera off and pinned [Minor boy's

first name] so I could stare at him up close… next thing I knew I was touching myself." By January of 2021, Wolf told his Telegram associate Alden Bunag that he had masturbated (out of view) a few times on video calls with students during the past year.

Wolf recounted his pre-pandemic chaperoning of overnight trips with students to some of his Telegram associates. He told "Mr. Pickles" and another associate that he stole a boy's underwear while on an overnight camping trip. He also told them that he masturbated into another child's underwear and put them back into the child's bag while camping.

Once engaged in his catfishing scheme with Strange, the defendant did not limit his criminal activity to "off-hours," but routinely communicated with his Telegram associates during the workday and encouraged Strange to target his victims even while in school. For example, on March 19, 2021, Strange and Wolf communicated about Minor 10 while Minor 10 was physically in Wolf's classroom with him. Strange, using his girl persona Alex Zampini, was also in communication with Minor 10 via Snapchat at the time and encouraged Minor 10 to ask to use the bathroom where he could send a sexually explicit image of himself (which he declined to do). A few days later, on the same day that Wolf met in person with Minor 10's parents to discuss strategies to improve his grade, Wolf suggested to Strange, "I have a hot idea—we're gonna be virtual for 4 days. If you introduce [Minor 10] to me [Ashley Hamilton] shortly before then, I could have him show off to 'me' during virtual class, maybe even my own." On April 6, 2021, in response to receiving a sexually explicit image of Minor 13, Wolf told Strange, "Fuck, extra hot to open this up while in my classroom… I don't have [Minor 13's] class today, but tomorrow I think I will be giving them some time off camera to do independent work."

The defendant told Strange and his other Telegram associates about the sexual gratification he received every day during what should have been routine moments in the school

day. On a regular basis, Wolf took pleasure in touching his students in ways that they would not have perceived as sexual but still were sexually stimulating to Wolf. For example, in October 2019, Wolf told his Telegram associate Alden Bunag about "find[ing] an excuse" to pick kids up. In February 2021, Wolf told Strange, "I've been starting to get careless tho and have put my hand on [Minor's first name] and [Minor 9] a few times… can't resist." Later that month, Wolf told Strange that he had been "flirting with [one of his minor victims] way too much at recess." After the same child injured himself at recess, Wolf told Strange, "I sat with him while we were waiting for his mom… and he was squeezing my hand to help deal with the excruciating pain. To the other boys still playing on the field, it looked like he and I were just sitting on the bench holding hands."

Throughout January and February 2020, the defendant shared a great deal of information with another Telegram associate about Wolf's ongoing grooming of a 10-year-old student[6] during elementary school recess, which Wolf regularly skipped his own lunch period to attend for the purpose of spending time with this boy. On January 8, 2020, Wolf told the associate:

> Went to elementary school recess today…. Found [Minor's first name] right away…I asked if he liked walking the trails in the woods, he said he did like it and started telling me about different animals in the woods that he knew about (frogs, etc), I asked if he wanted to show me his favorite spots and we took a little walk together, I put my hand on his shoulder and his back and messed up his hair a few times, **but I didn't know what to do to escalate things,** I figured that was more than enough for today, I loved touching him though hehe.

Wolf later told the associate, "I think it's working to my advantage that he doesn't have an older brother, I'm kinda acting in that role." Later that month, Wolf lamented that he had not seen the

---

[6] This child has been identified, and the FBI has made contact with his parents. He has not disclosed any hands-on abuse to date.

child as much recently because his lunch period changed with the semester, but Wolf had

developed a plan to resume their contact:

> Im gonna skip eating at the normal lunch one day so I can keep
> visiting [Minor boy's first name]. I have an idea for how to progress
> next. I'm gonna talk to him about fitness and working out and ask
> him to show me his muscles. His biceps and his abs, even though
> he probably doesn't have visible abs. I'm just gonna go for it and
> touch his tummy and tell him how strong he is. Will try to touch as
> low as possible near his waistband. Then tell him about some ways
> to make more muscle there so I can check his progress each week or
> something like that.

On February 6, 2020, Wolf told the associate:

> I did my exact plan… He didn't know what his abs were… So I
> explained and I actually was the one who pulled up his shirt to help
> with the explanation. I touched his tummy and he flinched and said
> my hand was really cold… I got hard but I'm not sure he noticed…
> I told him he had a great "pelvic muscle" – not even sure that is a
> thing… I asked if I could check it out further but it would require
> me to reach a little into his pants… I said I could only do it with his
> permission. **I told him that I coach middle school kids and it's
> important to have a strong pelvic muscle and I could give him
> some tips if I checked out more specifically how he was coming
> along…** I said I know he was taught that he shouldn't be touched
> under his pants so he couldn't tell anyone. He was excited about
> getting stronger, and he promised that he wouldn't tell and said it
> was ok for me to check him out lower… **I couldn't believe it but I
> guess he just trusts me which is exactly why it's illegal haha too
> easy to manipulate a kid… no pics but I put my hand under his
> waistband and actually slid it into his pants. I "accidentally"
> brushed my hand over his dick and immediately apologized…** I
> didn't leave my hand in for long, but I told him that I could check
> out his progress every week if he did the exercises I tell him.

Fortunately for this child, the Covid-19 pandemic shutdown schools in March 2020, and the

defendant could no longer groom him for hands-on abuse by isolating him from the other kids at

recess and taking him on walks on the wooded trails near the school's campus under the guise of

mentoring him as an aspiring middle school baseball player.

The defendant engaged in this criminal conduct despite many aspects of his life that should have deterred him from such behavior. He engaged in this conduct despite his stable upbringing and continued close relationship with his family. He engaged in this conduct despite being well educated and financially secure. He engaged in this conduct while going to great lengths to start a family of his own-- using a paid surrogate to father a child born in April 2021. The defendant's failure to abide by the law even with these supportive factors in place further justifies a life-equivalent sentence.

Moreover, the defendant did not draw a line at victimizing family. In fact, he targeted one of his own nephews for exploitation in the same way he victimized his students by catfishing them to produce child pornography. On January 12, 2020, before the Telegram communications with Strange began, Wolf shared his nephew's Snapchat handle with another Telegram associate (who fancied himself to be a successful "baiter" of children) and told him, "I want to see dick or pubes or both or as much as possible, please save screen captures of EVERY part of your communication with him." Wolf's nephew blocked the Telegram associate. Many months later, however, Wolf reinitiated his efforts to victimize his nephew and shared his information with Strange to bait. Wolf also discussed installing a spy camera in his nephew's bedroom when visiting.

In April 2020, Wolf told his Telegram associate "Mr. Pickles," "If I have a kid, it better not be a boy, cuz I'm gonna end up in jail if it is." Later that year, Wolf used a paid surrogate to father a child and informed several of his Telegram associates when the surrogate had a positive pregnancy test. Before finding out the child's sex, he told Mr. Pickles:

> I feel like I would be better equipped to raise a boy as a single
> parent, but I'll be happy with either… I do not have plans to be
> 'more hands on,' … but we'll see what happens… if my kid's

really hot maybe it'll be worth going to jail and ruining my life.
Not a girl tho. Icky.

Once the child was born in April 2021, he continued his child exploitation scheme with Strange and continued his regular communication with his other Telegram associates. He sent photographs of his newborn daughter to predators on the Internet. He traded child pornography and enticed boys to produce child pornography literally while holding his newborn daughter, feeding her, and trying to soothe her, all the while interspersing comments about his caretaking of her with his sexual exploitation of other children. He occasionally lamented how difficult it was for him to preview videos of child pornography while holding his daughter. When he used the services of a night nurse to help take care of her, he devoted extra time at night to catching up with his Telegram associates rather than sleeping. Although he told the presentence investigator that the surrogate remained anonymous, PSR ¶ 179, he told his Telegram associates about developing a relationship with the surrogate and learning that she had a 12-year-old son. She and her son visited Wolf in August 2021, and Wolf sent a photo of the 12-year-old to Strange, along with his Instagram handle, as another potential child victim for Strange to target on Wolf's behalf.

Though this is the defendant's first criminal conviction, he has already demonstrated a pattern of child exploitation by sexually exploiting multiple victims and engaging in years of communication with other sexual predators on the Internet. The defendant clearly was deeply entrenched in the world of child pornography. The Guidelines already reflect the fact that the defendant has no prior criminal record. He should not now receive any additional consideration for this reason. See *United States v. Borho,* 485 F.3d 904 (6th Cir. 2007) (There were no 'extraordinary circumstances' that justified a decreased sentence based on, among other considerations, the defendant's lack of a criminal history, lack of evidence that he had ever

- 19 -

molested a child, and a sex offender risk assessment that opined that the defendant was at low risk for re-offending); *United States v. Peterson*, 83 Fed.App'x. 150 (8th Cir. 2003) (appeals court reversed District Court's downward departure based on the low likelihood for re-offense and susceptibility to abuse in prison, as the first factor was already accounted for in the Guidelines and the second factor was inapplicable to the facts of the case); *United States v. Goldberg*, 295 F.3d 1133 (10th Cir. 2002) (defendant's lack of prior record, and low risk of recidivism are not valid grounds for downward departure because those factors are all taken into account in the Guidelines themselves). The defendant's lack of a prior record should not provide any basis to vary from the Guideline range, based on the facts of this case.

The vast majority of federal child pornography offenders have no prior records at the time that they are sentenced. *U.S. Sentencing Commission, Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System 320 (2011)* available at http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Mandatory_Minimum_Penalties/20111031_RtC_Mandatory_Minimum.cfm. This puts the defendant squarely in the heartland of most sex offenders in federal court. Indeed, in the Eastern District of Pennsylvania, a review of the sentences which were imposed for defendants who committed the same type of offenses shows that most defendants were first time offenders who pled guilty.

The defendant's own psychologist, Dr. Elliot Atkins, describes Wolf as a "man who has been, and always will be preferentially attracted to minors. This attraction is neither treatable [n]or curable." PSR ¶ 192. Somehow, in spite of this bleak description of Wolf's sexual preferences and in defiance of common sense, Dr. Atkins still opines that, with continued treatment, Wolf will present as someone with an "extremely low risk of recidivism." *Id.* The

Court's appointed psychologist, Dr. Jeffrey Summerton, takes a more realistic view of Wolf's future behavior, finding that it is "impossible to predict with any accuracy his risk of re-offense," given the lengthy amount of time he will spend in prison, which makes the question of recidivism "essentially an academic one at present." (Summerton report, p. 13). Dr. Summerton also expresses concern that Wolf's lack of insight and lack of understanding of his motivation for committing these offenses are **"potentially ominous signs" of Wolf's inability to refrain from future victimization of children**. (Summerton, p. 12). This lack of insight should also alarm the Court. Moreover, it should alarm this Court that despite the other evidence of Wolf's entrenchment in the child exploitation world, he insisted (lied) to Dr. Summerton that his illicit behavior was limited to the conduct charged in the Indictment and even tried to blame Strange for inviting him to into the child exploitation world by sending him unsolicited images of child pornography (Summerton, pp. 7-8) when Wolf had, in fact, been communicating with other offenders on Telegram for years and collecting child pornography from so long ago that he had to save it to CDs.

The government submits that the Court should give little weight to Dr. Atkins' report issued on the defendant's behalf. The defendant has already recidivated several times--- his crimes were not the result of an isolated incident, but a pattern of conduct over the course of many years, culminating in his arrest. During this time, the defendant did not seek treatment, despite having the means and relationships to do so. The defendant sought treatment only after being arrested and incarcerated, clearly motivated by a desire to minimize the punishment he would receive for his criminal conduct. Even if the Court credits Dr. Atkins' opinion to some degree, the defendant should not receive a downward variance based on any predicted "low risk of recidivism." The Guideline range in this case is based on the factors of the defendant's

present crimes, and should not be decreased based on some prediction of possible future criminal behavior. *See, e.g., United States v. Goldberg*, 295 F.3d 1133 (10th Cir. 2002) (defendant's lack of prior record and low risk of recidivism are not valid grounds for downward departure because those factors are all taken into account in the Guidelines themselves); *Borho,* 485 F.3d 904. The defendant's sentence should reflect the circumstances of his present crimes, and should not be based on a questionable prediction of future risk, which common sense and the defendant's own years-long pattern of behavior suggest is great.

The defendant has demonstrated by his own conduct that he is a true sexual predator whose criminal activity can only be stopped through incarceration. He has earned a guideline, life-equivalent sentence.

### 3. The seriousness of the offense, respect for the law, and just punishment

A significant term of imprisonment is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." § 3553(a)(2). These are serious offenses with lasting impact upon the victims. The sentence in this case must promote respect for the laws that the defendant has broken, and must make him understand the impact of his crimes. This can only be done by the imposition of a significant sentence of incarceration. A sentence within the Guideline range will adequately punish this defendant. He broke laws designed to protect children while employed in a position of community trust and authority. A life-equivalent sentence in his Guideline range has been well earned.

### 4. Deterrence

Deterrence is also one of the factors that calls for a significant sentence of incarceration. The defendant himself needs to be deterred from sexually exploiting children in the future. A life-equivalent sentence will accomplish this goal and based on the defendant's history, is the

only way to accomplish this goal and protect the community from him. Section 3553(a)(2) also mandates that the Court consider a sentence that adequately deters others who would commit similar offenses. The sentence in this case must give notice that the sexual exploitation of children has serious and significant consequences, particularly for those who choose educational professions only to abuse their positions to victimize children. A guideline, life-equivalent sentence will serve as a deterrent to others inclined to sexually exploit children using the Internet.

### 5. Consistency in Sentencing

The life-equivalent sentence sought by the government is consistent with sentences imposed in this District for similarly situated offenders who have committed similar crimes. In this District, defendants convicted of manufacturing child pornography typically receive sentences within or close to the recommended Guideline range. Offenders who engage in hands-on sexual abuse often receive life-equivalent sentences. *See, e.g., United States v. Zhinin* (17-383) (Smith, J.) (life sentence); *United States v. Maffei* (16-511) (Goldberg, J.) (statutory maximum sentence of 90 years' imprisonment); *United States v. Robert Caesar*, (18-525) (Pappert, J.) (statutory maximum sentence of 100 years' imprisonment imposed).

Offenders who engage in online production of child pornography typically receive lower sentences than those engaged in hands-on abuse, but these sentences are still frequently within or close to the sentencing Guideline range and well above the 15-year mandatory minimum. *See, e.g., United States v. Seibert* (17-572) (Leeson, J.) (sentence of 360 months' imposed where defendant used a fake teenage persona to entice two victims to produce sexually explicit images online; guidelines of 360-life); *United States v. Connor* (19-057) (Sanchez, J.) (sentence of 300 months' imposed where 22-year-old defendant enticed one teen victim online; guidelines called

for life imprisonment); *United States v. Cunningham* (18-391) (Diamond, J.) (sentence of 240 months' imposed where defendant, a public school teacher's aide, used a fake teenage persona to entice three victim students to produce sexually explicit images online; guidelines of 235-293 months' imprisonment); *United States v. Tyler Moury*, (21-433) (McHugh, J.) (sentence of 35 years' imposed where 24-year-old defendant enticed two teen girls to produce sexually explicit images online and produced images of one victim during a sexual encounter with her; guidelines of life imprisonment); *see also United States v. Totoro*, (15-291) (Pappert, J.) (sentence of 300 months' imprisonment imposed for former tennis coach who produced images of one athletic student during sexual abuse of her; guidelines of 292-365 months).

The government submits that the defendant's crimes are far worse than the "typical" online offender, including those in the cases described above, who still received very lengthy sentences. The defendant victimized a greater number of children than these offenders, was older than most of these offenders, was far more entrenched in the child exploitation community than most of these offenders, and betrayed and abused his position as a teacher by committing these crimes. For all these reasons, the defendant has earned a life-equivalent, guideline sentence.

6. Guideline Policy Statements Issued by the Sentencing Commission

The sentence sought by the government also comports with the policy statements and studies conducted by the United States Sentencing Commission ("USSG"). In October 2021, the USSG published a report entitled Federal Sentencing of Child Pornography Production Offenses (hereinafter "Child Pornography Production Report"). *See* www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20211013_Production-CP.pdf. This report is a compilation of data from 2005

through 2019 for every offender convicted in the United States of the crime of production of child pornography. Importantly, the Sentencing Commission found that in the 15-year period studied, the long-term trend shows that "[C]ourts consistently sentence child pornography production offenders to lengthy sentences." *See Child Pornography Production Report* at 21. Indeed, in analyzing the bases for the Courts' imposition of such lengthy sentences, the Sentencing Commission recognized that "child pornography production offenses are serious crimes that memorialize the sexual abuse and exploitation of children." *Id.* at 54.

The Child Pornography Production Report analyzed a number of cases over the 15-year study period, and determined "average" sentences imposed for production offenses.[7] The data showed that the "average" sentence increased in length for the most egregious of production offenders. The Commission found that courts imposed longer than average sentences when

---

[7] The Report found that the average sentence imposed for all production crimes was 275 months' incarceration. *Id.* at 21-22. Importantly, the "average" sentencing numbers are based on data that inaccurately results in "average" sentences that are actually *lower* than the true average sentence. In calculating these averages, those defendants who received sentences of 470 months or greater (including life) were limited in the sentence average computations as just 470 months' incarceration. *See* Child Pornography Production Report at 21, FN 35. That means that those who received sentences greater that 470 months' incarceration were capped at just 470 months (39 years), *thus creating an inaccurate "average" sentence that is lower than the true average sentence imposed for these most egregious crimes.*

Though the Report shows that 57% of the sentences represented downward variances from the applicable sentencing Guideline range, more than 20% of that number was based on government-sponsored downward variances. *Id.* at 22. In other words, only a little over one-third of the cases involved downward variances granted by the Court without the prosecutor's motion. A recent study ordered by another Court in this district revealed similar results for the EDPA: downward variances were imposed in only 36% of the cases on the Court's own motion. The majority of the EDPA sentences for § 2251 offenses remain within the calculated Guideline ranges. **Significantly, in 16% of the EDPA cases, a sentence of life or life-equivalent incarceration was imposed, even when the offender had pleaded guilty and had no prior criminal history.**

As noted above, for many of these offenders, the calculated Guideline range is life imprisonment, so that even a sentence that represents a "downward variance" still results in decades in prison.

various factors were present in a case, many of which are also present in defendant Wolf's case, including: the defendant being a teacher who maintained a position of trust or authority, *id*. at 45; the defendant's use of coercive tactics and enticements, *id.* at 48; the defendant's misrepresentation of his identity to commit the offense, *id.*; the defendant's engagement in non-production child pornography conduct, *id.* at 49, and the defendant's pattern of sexual exploitation of children, *id.* at 50.

In short, the defendant's conduct is far more egregious than the "average" online child exploitation offender, and he has earned a life-equivalent sentence.

      7.  <u>Other considerations</u>

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner… ." § 3553(a)(2)(D). The defendant can and should receive sex offender treatment while serving his federal prison sentence.

      8.  <u>Restitution and Financial Penalties</u>

Restitution is mandatory pursuant to 18 U.S.C. § 2259; however, to date, the government has not received any restitution requests from victims identified in this case. The government continues to work with some victims and their families to determine their actual and projected losses for the purpose of compiling restitution claims on their behalf.

Here, the government requests that the Court defer its determination on restitution until a date no more than 90 days after the defendant's sentencing because the victims' losses are not presently known to the government. Under 18 U.S.C. § 3664(d)(5), if the victim's losses are not ascertainable before sentencing, the government or the probation officer is required to inform the Court, and the Court "shall set a date for the final determination of the victim's losses, not to

exceed 90 days after sentencing." The overarching purpose of Section 3664—the procedural arm of the restitution scheme in Section 2259—is "to ensure that victims of crime receive full restitution." *Dolan v. United States*, 560 U.S. 605, 612 (2010). In *Dolan*, the Supreme Court determined that the statute's "effort[] to secure speedy determination of restitution is *primarily* designed to help victims of crime secure prompt restitution rather than provide defendants with certainty as to the amount of their liability." *Id.* at 613. Construing the 90 days so as to limit the victim's ability to recover statutorily mandated restitution would subvert the statute's principal objective. *See id.* at 613 ("to read the statute as depriving the sentencing court of the power to order restitution would harm those—the victims of crime—who likely bear no responsibility for the deadline's being missed and whom the statute also seeks to benefit"). Noting that failure to comply with this 90-day directive carries with it no statutory consequences, the Supreme Court held that when, as here, a defendant is aware of the existence of mandatory restitution and the court's intention to address it at a later date, exceeding the 90-day period does not deprive the court of jurisdiction to order mandatory restitution. *See id.* at 615 (where defendant knows that restitution is mandatory prior to expiration of 90-day period, missing statutory hearing date does not invalidate hearing). Consequently, where the government seeks a continuance within the 90 days for the benefit of the victims of the defendant's crimes, granting such request is appropriate and falls squarely within the situation contemplated by the statute.

Deferring restitution in this case would serve the statute's purpose of ensuring the victims receive full restitution for their losses. This 90-day period also will encompass the sentencing of co-defendant Kray Strange, scheduled for March 31, 2023.

The defendant is subject to the Justice for Victims of Trafficking Act (JVTA), and the government asks the Court to impose the mandatory, additional special assessment of $5,000 per

count pursuant to 18 U.S.C. § 3014 because the defendant is not indigent, for a total JVTA

assessment of $40,000. PSR ¶ 225. The defendant is also subject to the provisions of the Amy,

Vicky, and Andy Child Pornography Victim Assistance Act of 2018 (AVAA), which provides

that the court shall assess not more than $50,000 on each count, for a total possible AVAA

assessment of up to $400,000. 18 U.S.C. § 2259A; PSR ¶ 226. The government requests that

the Court assess the defendant a total of $100,000 under the AVAA.

## V.    CONCLUSION

For the reasons set forth above, the appropriate considerations of sentencing favor the

imposition of a lengthy sentence in this case.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney

*/s/ Kelly Harrell*
KELLY HARRELL
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on this date I caused a true and correct copy of the foregoing

Government's Sentencing Memorandum to be served by email upon counsel for defendant:

Arthur Donato, Esq.
art@artdonato.com

Heather J. Mattes, Esq
hjm@hjmattes.com


*/s/ Kelly Harrell*
KELLY HARRELL
Assistant United States Attorney


Date:  February 9, 2023