```
                  UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,.     Case No. 2:22-cr-00035-MAK-1
                           .
           Plaintiff,      .
                           .    U.S. Courthouse
      v.                   .    601 Market Street
                           .    Philadelphia, PA
ANDREW WOLF,               .
                           .    February 16, 2023
           Defendant.      .
. . . . . . . . . . . . ..      9:07 a.m.


             PARTIAL TRANSCRIPT OF SENTENCING HEARING
                BEFORE HONORABLE MARK A. KEARNEY
                  UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:      KELLY M. HARRELL, ESQ.
                        UNITED STATES ATTORNEY'S OFFICE
                        615 Chestnut Street, Suite 1250
                        Philadelphia, PA  19106
                        (215) 861-8646
                        kelly.harrell@usdoj.gov


For the Defendant:      ARTHUR DONATO, JR., ESQ.
                        216 West Front Street, 2nd Floor
                        Media, PA  19063
                        (610) 565-4747
                        art@artdonato.com

                        HEATHER J. MATTES, ESQ.
                        LAW OFFICES OF HEATHER J. MATTES
                        105 South High Street, 3rd Floor
                        West Chester, PA  19382
                        (610) 431-7900
                        hjm@hhjmattes.com

                        Defendant present in custody
```

2

Audio Operator:          KIMBERLY SCOTT

TRANSCRIBED BY:          VALORI WEBER
                         Weber Reporting Corporation
                         PO Box 510376
                         Milwaukee, WI  53203
                         (970) 405-3643


          Proceedings recorded by electronic sound
     recording, transcript produced by transcription service.

```
 1                         PROCEEDINGS
 2              THE BAILIFF:  All rise.  Court is now in session.
 3    The Honorable Mark A. Kearney presiding.
 4              THE COURT:  Good morning.
 5              MR. DONATO:  Good morning, Your Honor.
 6              MS. HARRELL:  Good morning, Your Honor.
 7              THE COURT:  Please be seated.  Good morning.
 8              We're here this morning in the matter of the
 9    United States v. Andrew Wolf.  May I have the appearance,
10    first of the United States.
11              MS. HARRELL:  Yes.  Good morning, Your Honor.
12    Kelly Harrell on behalf of the United States, and with me at
13    counsel table is Special Agent James Sajak (phonetic) from
14    FBI.
15              THE COURT:  Welcome.  Thank you, sir.
16              MS. HARRELL:  Good morning, Your Honor.
17              THE COURT:  And on behalf of Mr. Wolf?
18              MR. DONATO:  Good morning, Your Honor.  Arthur
19    Donato for Mr. Wolf, ID number 31666.  And with me is
20    Heather J.  Mattes.
21              THE COURT:  Thank you.  Welcome.
22              MS. MATTES:  Thank you, sir.
23              THE COURT:  And thank you all counsel for their
24    terrific sentencing memorandum.  They were very helpful.
25    Thank you very much.
```

1          Mr. Donato, do you expect Mr. Wolf will wish to

2  allocute today?

3          MR. DONATO:  Yes, sir, he will.

4          THE COURT:  Thank you.  Kim, would you kindly --

5  Madam Deputy, would you kindly swear Mr. Wolf.

6          Mr. Wolf, please rise.

7          THE CLERK:  Please raise your right hand and state

8  your name for the record.

9          THE DEFENDANT:  Andrew Wolf.

10          THE CLERK:  Do you swear that the testimony you

11  shall give the Court shall be the truth, the whole truth,

12  and nothing but the truth, so help you God?

13                    ANDREW WOLF, DEFENDANT, SWORN

14          THE DEFENDANT:  I do.

15          THE CLERK:  Thank you.

16          THE COURT:  Thank you, sir.

17          Ms. Harrell, have you notified under the Victims'

18  Act all the victims of these offense?

19          MS. HARRELL:  Yes, Your Honor.

20          THE COURT:  Okay.  How did you do so?

21          MS. HARRELL:  Your Honor, I spoke to most of the

22  parents of the victims myself by phone, along with Agent

23  Sajak.  Agent Sajak had other conversations with some sets

24  of parents, and one family was notified via the victim

25  notification system because we don't have contact

1    information for them currently.

2            THE COURT:  Okay.  Have you notified the National

3    Center?

4            MS. HARRELL:  Yes.  Yes, we have, Your Honor.

5            THE COURT:  All right.  Thank you.

6            Mr. Wolf, do you know why you're in court today?

7            THE DEFENDANT:  Yes.

8            THE COURT:  Okay.  Have you been under the

9    influence of any illegal drugs or alcohol in the last 72

10   hours?

11           THE DEFENDANT:  No.

12           THE COURT:  Have you been -- have you taken any

13   medications?

14           THE DEFENDANT:  No, I haven't.

15           THE COURT:  Have you taken any medication to

16   affect your ability to answer our questions today?

17           THE DEFENDANT:  No.

18           THE COURT:  Other than natural anxiety of being in

19   a courtroom and in a sentencing hearing, which everyone

20   appreciates, are you able to answer our questions today in a

21   competent matter in your view?

22           THE DEFENDANT:  Yes, I am.

23           THE COURT:  Okay.  I'm going to refresh us a

24   little bit why we're here today, Mr. Wolf, to give us some

25   perspective.

1             If you hear anything that -- if you hear anything

2    at all today that you don't understand what I'm saying,

3    please tap your counsel, and they'll interrupt me.  Okay?

4    It's most important that you understand what I'm saying

5    today.  Okay?

6             THE DEFENDANT:  Okay.

7             THE COURT:  We're here today arising from a tip on

8    July 12th, 2021 from the National Center for Missing &

9    Exploited Children, which learned from Dropbox of an email

10   address awolf@sch.org that uploaded a file depicting

11   suspected child pornography on June 29th, 2021.

12            That video was seven minutes long, with two naked

13   boys, approximately 10 to 14 years old, masturbating each

14   other and then penetrating each other with fingers and

15   penises.

16            That led to a further investigation.  It

17   eventually led to a search warrant at your residence, which

18   was executed on October 7th, 2021.

19            You were then arrested.  In that discussion, you

20   made some statements that we may talk about later concerning

21   your understanding of your culpability and your inability to

22   fully recognize the conduct you were engaged in.

23            You've been in custody since October 7th, 2021

24   across the street.  So that's approximately four months --

25   approximately 16 months or so, a little more than 16 months.

1           You have been fully compliant with all conditions.

2   In fact, you have been helpful to other persons in the

3   facility in helping them get a GED, etc.

4           During that investigation, though, from the FBI,

5   there was an investigation of your phone, which led to a

6   gentleman named Kray Strange from Carthage, New York, who

7   participated in your conduct.  That's an issue today.

8           The United States arrested Mr. Strange on

9   January 5, 2022.  Mr. Strange is awaiting sentencing.

10  Mr. Strange is on the autism spectrum, unable to -- possibly

11  unable -- being evaluated and possibly unable to understand

12  or appreciate the consequences of his actions, possibly,

13  although it's more having to do with the term of sentencing

14  than his ability to understand his conduct.

15          Your conduct led the grand jury to return an

16  indictment against you and Mr. Strange on February 3rd,

17  2022.  It's important you understand today, Mr. Wolf, that I

18  have an obligation to address all eight counts.

19          And so, in Count I, the grand jury charged you

20  with conspiracy to manufacture child pornography from May 2,

21  2020 to October 7th, 2021.  That's the day of your arrest.

22          That Congress tells me, the people tell us, the

23  people we elect tell us, that that requires a guilty plea.

24  A conviction requires a mandatory 15-year sentence up to 30

25  years in prison for that conspiracy, along with a up to

1    $250,000 fine.

2              Grand jury also charged you with in Counts 2

3    through 8 and identified various victims, the manufacturer,

4    an attempted manufacturer of child pornography and aiding

5    and abetting from and depending on the count, August 29 of

6    2020 and up to September 7 of 2021.

7              Each one of those counts has a mandatory 15-year

8    sentence, up to 30 years in prison on each count, with a

9    mandatory $250,000 fine.  Excuse, not mandatory.  The fine

10   of $250,000 per count.

11             You recognized your guilt and you came before us

12   on June 23, 2022, if you remember that.  And we had all this

13   discussions, how sentencing works at that stage.

14             You also, on the same day, had an opportunity to

15   meet with our officer and he prepared for us a detailed pre-

16   sentence investigation report.

17             Mr. Donato, is that your understanding of the

18   facts leading up to today -- of the chronology leading up to

19   today?

20             MR. DONATO:  Yes.  That's my understanding of the

21   chronology, Your Honor.

22             THE COURT:  Thank you.  Ms. Harrell, is that your

23   understanding of the chronology leading to today?

24             MS. HARRELL:  Yes, Your Honor.

25             THE COURT:  Okay.  So, we begin, Mr. Wolf, as I

1 | told you we would, the way sentencing works in the United

2 | States, is we address really three steps.  Well, four steps.

3 |       The first step is I tell you what Congress sets

4 | the -- the people we elect set the penalty, the maximum

5 | penalty.  And then there's a great amount of discretion

6 | given to judicial officers.

7 |       The way we exercise that discretion is by a

8 | variety of factors that Congress gives us in Section 3553 of

9 | Title 18 United States Code.  And those factors, among

10 | others, include our evaluation of something called

11 | guidelines.

12 |       And those guidelines, I talked about in your plea,

13 | identify for the history, all history of the entire cases

14 | across the United States every year.

15 |       They canvas and they study what judges are doing

16 | around the country.  They recommend what judges should be

17 | doing around the country.

18 |       It'd be unfair to you to get a much greater

19 | sentence because you're in front of me.  It'd be unfair to

20 | others for you to get a much lesser sentence because you're

21 | in front of me as opposed to a person down the hall or a

22 | person somewhere else in the country.

23 |       And so we look at these guidelines, but they're

24 | not mandatory on me.  I don't have to follow them.  I have

25 | to consider them, and I will consider them, and we'll talk

1    about them.

2            In this case, they're extraordinarily high.  So,

3    in this case, it is impossible to enter a guideline sentence

4    given our mortal nature.  But I look at those and consider

5    the factors that go into them.

6            We begin this by asking our officer who came and

7    interviewed you to prepare a pre-sentence investigation

8    report.  And that report is very detail -- as you've seen

9    maybe, is detailed and provides a tremendous amount of

10   information to me.

11           I don't have the opportunity, Mr. Wolf, to

12   interview you, and so I rely extensively on those reports as

13   well as the memos given -- memorandum given us by counsel.

14           And so, the first thing I turn to is the pre-

15   sentence report and ask the United States, have you received

16   a copy of the revised February 9th pre-sentence

17   investigation report and whether you have any corrections to

18   the report.

19           MS. HARRELL:  I did receive a copy, Your Honor,

20   and I don't have any corrections.

21           THE COURT:  Do you believe that the financial

22   numbers represented on that report of February 9 are

23   accurate?

24           MS. HARRELL:  Yes, as far as the Government knows,

25   Your Honor.

```
1              THE COURT:  Okay.  Mr. Donato, you had a chance to
2   see the February 9 revised pre-sentence investigation
3   report?
4              MR. DONATO:  Yes, Your Honor.  And we went over it
5   with Mr. Wolf.
6              THE COURT:  Okay.  Do you think there's any
7   corrections?
8              MR. DONATO:  I don't think so.
9              THE COURT:  Do you believe the financial numbers
10  represented in that report representing Mr. Wolf's assets
11  are accurate as of today?
12             MR. DONATO:  Yes, sir.  I do.
13             THE COURT:  Do you believe there's any movement of
14  those assets since February 9th?
15             MR. DONATO:  I have no reason to believe that.
16             THE COURT:  Okay.  Thank you, sir.  Mr. Wolf, have
17  you had a chance to review this pre-sentence investigation
18  report?
19             THE DEFENDANT:  I have, Your Honor.
20             THE COURT:  Okay.  You had a chance to talk about
21  it with your counsel?
22             THE DEFENDANT:  Yes.
23             THE COURT:  Did you have a chance to review it
24  with your counsel before I saw it?
25             THE DEFENDANT:  Yes.
```

```
 1              THE COURT:  You had a chance to speak to the
 2   officer about it.  Is that correct?  A probation officer?
 3              THE DEFENDANT:  Not after it was --
 4              THE COURT:  No, no.  Before.
 5              THE DEFENDANT:  What --
 6              THE COURT: You had a chance to interview with him,
 7   right?
 8              THE DEFENDANT:  Interview, yes.  Yes.
 9              THE COURT:  Okay.  And do you -- have you -- do
10   you know any corrections to the report?
11              THE DEFENDANT:  No, not with the revised version.
12              THE COURT:  Okay.  Are the financial numbers
13   represented on that report accurate as of today to your
14   knowledge?
15              THE DEFENDANT:  I believe so.
16              THE COURT:  Did your counsel answer all your
17   questions about the report before I saw it?
18              THE DEFENDANT:  He did, yes.
19              THE COURT:  Okay.  Do you need more time to talk
20   about the report with your counsel?
21              THE DEFENDANT:  No, sir.
22              THE COURT:  Okay.  Are you satisfied with the
23   representation provided by your attorneys?
24              THE DEFENDANT:  Yes, I am.
25              THE COURT:  Okay.  So, I told you a moment ago
```

1    what Congress tells me generally speaking for Count 1 --
2    Counts 1, 2, and so on, to Count 8.
3              I just want to refresh this here because they have
4    different -- there's a different idea here.  I want to make
5    sure we're all talking about it.
6              Counts 1 to 7 all have a minimum of 15 -- Congress
7    says a minimum of 15 years and a maximum of 30 years per
8    count.  But those counts can be concurrent.  In other words,
9    they don't have to be consecutive.
10             So, while easy math that you could teach me would
11   tell me that 30 times 8 would be 240 years, that's not
12   necessarily true because they don't have to be consecutive.
13   They can be concurrent.  One or more could be concurrent,
14   for example.
15             For the same reason, it's not 8 times 15.  They
16   could be concurrent.
17             In addition, Congress tells me that I must impose
18   a term of supervised release of five years up to life per
19   count.  Again, that could be concurrent.
20             Congress also tells me I can impose a fine of up
21   to $250,000 and I must impose a special assessment of $800,
22   being $100 per count.
23             In addition, Congress has told us, federal judges,
24   that we must consider a restitution of $5,000 per count for
25   any non-indigent person who's convicted of these offenses

1    under something called the Justice for Victims of

2    Trafficking Act.

3              In addition, I must consider mandatory restitution

4    under the Amy, Vicky, and Andy Child Pornography Victim

5    Assistance Act after considering factors under Section 3553.

6              In addition, Congress authorizes under Section

7    3664 -- not authorizes.  Directs us to consider restitution

8    and shall reimburse the victim of any trafficking of their

9    pictures based on a variety of factors provided in Section

10   3663A and 3664 of Title 18 United States Code, and in

11   addition, cost of prosecution.

12             So, what you're looking at Mr. Wolf is two types

13   of -- I'm sure you had a chance talk about, two types of

14   penalty sentence.  One, of course, is jail and the second is

15   financial.  It's a fine.  Restitution and fines.  And that's

16   how it works.

17             So, we start in many ways with what jail is.

18   That's what everybody understands the beginning.

19             And I'm going to ask first, Ms. Harrell, if you

20   agree with the offense level of 43 as calculated over 7

21   different groups of offenses identified by the officer in

22   the report, along with the criminal history category of 1?

23             MS. HARRELL:  Yes, Your Honor.

24             THE COURT:  Okay.  Mr. Donato, do you agree with

25   the offense level of 43 spread out as calculated over 7

```
 1    different groups of offenses --
 2               MR. DONATO:  Yes, sir.
 3               THE COURT:  -- and history category of 1?
 4               MR. DONATO:  Yes, sir.
 5               THE COURT:  Okay.  I have separately reviewed it,
 6    Mr. Wolf.  It's my obligation to take the officer's report,
 7    study it, to review it, to look and make sure that the
 8    calculation is accurate.
 9               In this case, as you saw, it would take someone of
10    your intelligence and math to maybe understand how those
11    groupings work.  I'm not joking.  It's a very difficult
12    calculation.  I commend our officer for his work on this
13    effort.
14               And I agree with him after spending a long time
15    understanding it that the offense level is 43, which is the
16    offense level after you consider all the 7 different groups
17    of offenses and the criminal history category of 1.
18               Criminal history category of 1, Mr. Wolf, reflects
19    the fact that you are not a prior offender.  It's the lowest
20    level offense level.
21               What this means, sir, is that the United States
22    Sentencing Commission, the people that are nominated by the
23    president, confirmed by the United States Senate, including
24    my colleague, Judge Restrepo, among others, have recommended
25    to us, that federal judges, consider for your offenses, your
```

1   guilty offenses, a term of life in prison.

2            But since none of the offenses that Congress has

3   set include a life in prison term, I'm not permitted to do

4   that.  Congress sets the cap.

5            So, they authorize a guideline range of 2,880

6   months in custody.  That's what I was talking about.  It's

7   not possible.  So, by definition, you have to vary down from

8   2,880 months.

9            The Sentencing Commission does not recommend

10  probation, nor does Congress.  Sentencing Commission

11  recommends following Congress, supervised release of five

12  years to life in each count.

13           Sentencing Commission recommends a fine of 50,000

14  to 250,000 per count.  Of course, that can be concurrent.

15  Restitution, which is set by Congress of $800, and the

16  congressional restitution.

17           That is the various restitution acts under either

18  the -- under the JVAA, the AVAA or the -- or under Section

19  3663 and 64.

20           So, I now turn, if I may, to ask counsel for the

21  United States if there's any objections to the -- I asked

22  about corrections.  Do you have any objections to the

23  report?

24           MS. HARRELL:  No, Your Honor.

25           THE COURT:  Okay.  Mr. Donato, any objections to

1    the report?

2                  MR. DONATO:  Nothing, Your Honor.

3                  THE COURT:  Thank you, sir.  I do have -- there is

4    no request for departure or variance from the United States.

5    Is that correct?

6                  MS. HARRELL:  That's correct, Your Honor.

7                  THE COURT:  Okay.  I do have from -- I think Ms.

8    Mattes, your memorandum requested for variance.  Is that

9    correct?  A downward variance?

10                 MS. MATTES:  That's correct, Your Honor.

11                 THE COURT:  Okay.  So we'll deal with that.  But

12   that is the nature of a 3553 argument, if I understand it

13   correctly, right?

14                 MS. MATTES:  That's correct.

15                 THE COURT:  Okay.  Thank you.  Okay.  Let's turn,

16   if I may then.  So, I just described what Congress tells us

17   and the Sentencing Commission tells us about incarceration.

18   Let's talk next about restitution and see if I understand

19   this.

20                 And United States, it comes at the back of your

21   memo, and I don't blame you for that.  Your focus is on what

22   happens.  But it's at this stage that I'd like to put these

23   things up front, so I understand the whole world of

24   sentencing in this.

25                 Explain to me -- I understand the Juvenile Act and

1   I understand the Amy Act and how they work.  You have a

2   recommendation of $100,000 under the Amy Act.  I could go up

3   to 400,000.  Why are you recommending 100,000?

4           MS. HARRELL:  Your Honor, that recommendation

5   comes from taking into account the fact that I am

6   anticipating restitution requests being made on behalf of

7   the specific victims in this case.

8           However, as the Court knows, I've requested to

9   defer the restitution component of the sentencing for 90

10  days while those claims are put together.

11          THE COURT:  Okay.  So, just so we're clear, the

12  Juvenile Act and the Amy Act go to the national profile,

13  right?  They go to a national fund for exploited children,

14  right?

15          MS. HARRELL:  Correct, Your Honor.

16          THE COURT:  Okay.  The restitution that you're

17  seeking under 3663 is to the -- essentially the families or

18  the boys that are identified in the indictment.  Is that

19  correct?

20          MS. HARRELL:  Correct, Your Honor.

21          THE COURT:  Okay.  And do I understand it from

22  your memo that nobody has come forward with an affidavit of

23  restitution as yet?

24          MS. HARRELL:  That's correct, Your Honor.  And

25  frankly, that's in part because I -- that has not been at

1    the forefront of the Government's mind.  And I've talked

2    with several of the families about putting together those

3    claims.

4           Unlike in many other child porn pornography cases,

5    these victims are first-time victims, so to speak.  So, we

6    don't have that kind of workup in terms of their images

7    being traded, their counseling costs projected into the

8    future, and all of that.

9           So that's something I need to work on with the

10   families to compile the claims.  And I would like the

11   opportunity to do that after today.

12          THE COURT:  Well, Congress gives you that

13   opportunity.

14          MS. HARRELL:  Yes.

15          THE COURT:  As will I.  Just let me be clear here.

16   I'm going to ask you to do that relatively quickly.  What

17   I'm going to --

18          I just confirmed that this gentleman -- that Mr.

19   Wolf has sufficient liquid assets, and I don't want anybody

20   going -- in many of these cases -- you know better than I

21   do.  We read the stories about every time a child gets a

22   check, it revisits trauma.

23          MS. HARRELL:  Absolutely.

24          THE COURT:  I don't want that.

25          MS. HARRELL:  Yep.

```
 1              THE COURT:  I want a lump sum if I can.

 2              MS. HARRELL:  Understood.

 3              THE COURT:  Okay.  So, I don't want to wait four

 4    months, five months, six months.  I want the United States,

 5    as soon as they can, to urge the families to get that

 6    information to you.

 7              MS. HARRELL:  Understood.

 8              THE COURT:  If they're not in there, they're not

 9    getting it.  I know the Supreme Court has said we're worried

10    about conviction restitution, but I -- this is unfair.  I

11    view the case as a case with Fifth Circuit.  I view this as

12    really penalty if we keep paying, if we keep delaying

13    restitution.

14              MS. HARRELL:  Yes, I understand, Your Honor.

15              THE COURT:  Okay.

16              MS. HARRELL:  And that is my intent after today to

17    begin having more involved conversations about that topic

18    with the families.

19              THE COURT:  Yeah.  Please urge the families.  This

20    is crucially important and it's a short window also.  Also,

21    urge the families, this is not the time you think about

22    recovery somewhere else.  This is the time the United States

23    Congress has given people to get restitution.

24              MS. HARRELL:  Yes.  And to be fair, I know the

25    Court understands this and a common sense tells us this, but
```

```
 1    this is not the kind of case where any amount of restitution

 2    would ever make a victim whole.

 3                THE COURT:  Yeah.

 4                MS. HARRELL:  And that's where the Government

 5    starts as well.

 6                THE COURT:  Yeah.  Unfortunately -- fortunately,

 7    unfortunately, the people we elect have defined what

 8    restitution could be.

 9                MS. HARRELL:  Yes.

10                THE COURT:  Right.  So, it's not -- we don't get -

11    - they don't recognize the true concept of pain and

12    suffering --

13                MS. HARRELL:  Yes.

14                THE COURT:  -- which is what this is about to the

15    parents and the boys.

16                MS. HARRELL:  Right.  Yes.

17                THE COURT:  But there are costs of necessary

18    medical related professional services, and going forward,

19    relating to physical, psychiatric, and psychological care.

20    So, the -- I don't think -- these are all boys.  I don't

21    think we have lost income and I'll leave the rest to you.

22                MS. HARRELL:  Yes.  Thank you, Your Honor.

23                THE COURT:  All right.  So, in addition, just so

24    I'm clear, United States, today, I have the absolute

25    discretion to enter the words under the Amy Act and the
```

1    Juvenile Victim Act, as well as a fine.  Where in the order

2    of priority does the payments under this restitution land?

3              MS. HARRELL:  Yes, Your --

4              THE COURT:  In other words, this 3663 restitution

5    to the boys themselves.  Where does this land?

6              MS. HARRELL:  Yes, Your Honor.  My understanding

7    is that, first, any special assessments would be paid,

8    including then the Justice for Victim of Trafficking Act

9    assessment and the Amy, Vicky, and Andy assessment, followed

10   by restitution, followed by a fine.

11             THE COURT:  You believe 3653 is third?

12             MS. HARRELL:  I do, Your Honor, but please correct

13   me if I'm wrong.

14             THE COURT:  Oh, I know.

15             MS. HARRELL:  I'm okay.

16             THE COURT:  I'm asking you.

17             MS. HARRELL:  Okay.

18             THE COURT:  I haven't gotten to it yet.

19             MS. HARRELL:  Okay.

20             THE COURT:  I don't read the case law that way,

21   but --

22             MS. HARRELL:  Your Honor, if I may, I'm receiving

23   some assistance from someone in our financial litigation

24   unit --

25             THE COURT:  Okay.

1    MS. HARRELL:  -- who's sitting just in the front

2    row.  And he tells me, which certainly makes sense, that

3    restitution actually comes second.

4    So, after the special assessment ordered per

5    count, the $100 special assessment, restitution comes next,

6    followed by the extra mandatory special assessments,

7    followed by a fine.

8    THE COURT:  Right.  When you say -- let's be

9    clear.  When you say -- that means the 3653 assessment goes

10   before the JVAA and the Amy Act?

11   MS. HARRELL:  Correct, Your Honor.

12   THE COURT:  Yeah, that's it.  That would be the

13   way I read it as well.  I just wanted to be clear.

14   MS. HARRELL:  Understood.

15   THE COURT:  Okay.  So, the issue we're going to

16   have then is whenever I enter a restitution order under the

17   acts is going to have to somewhat wait until you receive --

18   until we get the -- until I get your affidavits and get a

19   hearing -- we'll set a hearing about 100 days out, 120 days

20   out.

21   MS. HARRELL:  Understood, Your Honor.

22   THE COURT:  Okay.  So, we'll still have -- we'll

23   enter them today, but they should not be collected until

24   such time -- as I understand it, until such time as we have

25   a full number.

```
 1              MS. HARRELL:  Yes.  Understood.

 2              THE COURT:  Is that correct?  Is that your

 3   understanding?

 4              MS. HARRELL:  Yes.

 5              THE COURT:  Okay.  Mr. Donato, do you have any

 6   different understanding of this?

 7              MR. DONATO:  I do not, Your Honor.  And perhaps

 8   the Government and us can come to an agreement once

 9   everything is finalized.

10              THE COURT:  Mr. Donato, your experience leads you

11   to anticipate my next question.  That is, I'm hoping that

12   you will -- that Mr. Wolf and you will be able to come to

13   some type of agreement to recognize this a fair number of

14   compensation once you see what people are claiming.  I'm not

15   asking you to do it in dark, but once you see people

16   claiming.

17              Okay.  All right.  So, I have set aside as much

18   time as you need today, but unfortunately -- no.

19   Fortunately, for 75 citizens from 30 countries, I get the

20   privilege of sitting at 10:30 in a naturalization service,

21   which is the best thing we do in this courthouse.  This is

22   the worst.  That's the best.

23              In my day, I'd do them back-to-back in the same

24   morning.  Just one of those things about being a squirrel as

25   a federal judge, right?  You jump around all over the place.
```

1          So, I have to break at around 10:25 or so, and

2    there's 75 people and very happy families sitting downstairs

3    in a ceremonial courtroom.

4          Anybody here who wants to see that by a break,

5    you're certainly welcome to see that.  It is a moving event.

6    People who desperately want to be -- people who escaped

7    tyranny and in many cases physical abuse to come to the

8    United States.  Today is their day.  And so today they get

9    naturalized in front of us.

10         So, if anybody wants to do that at 10:30 this

11   morning, you can -- certainly welcome.  It's a public

12   hearing and certainly welcome to attend.

13         Okay.  So, I turn to you.  I've read your

14   extraordinarily well-prepared memorandum.  I'm also aware of

15   Mr. Strange's condition because of our other proceeding with

16   Mr. Strange.

17         I've also had a chance to read the doctor's

18   reports from Dr. Somerton (phonetic) and Dr. Atkins.  And

19   I'll hear from you.  Anything else you wish to add?

20         I understand your recommendation, a life

21   equivalent, and you've now told me about the restitution.

22   So, I'm willing to hear anything you wish to, including any

23   victims, anything you wish to present to me.

24         MS. HARRELL:  Yes, Your Honor.  Thank you.  Would

25   Your Honor like me to speak at the podium or counsel table?

1          THE COURT:  Wherever you're comfortable.  It's not

2    necessary -- as long as Madam Deputy can hear you.

3          MS. HARRELL:  Okay.  Thank you.  Your Honor, I

4    want to start off by offering a few remarks, and then I know

5    that at least one parent of one of the victims does wish to

6    address the Court, which I will give her -- I'd like to give

7    her.

8          THE COURT:  Before you do that, I want to also

9    reflect that while names have not been disclosed, we have

10   received, I would say, close to 10 or a dozen letters from

11   various parents, including one -- well, from various parents

12   as well as, I don't know if the young man is here, but a

13   very compelling letter.  I'm sure that Mr. -- Mr. Donato,

14   have you seen these letters?

15         MR. DONATO:  Yes, sir.

16         THE COURT:  Okay.  A very compelling letter from a

17   person identified as Minor 1.  So, I've incorporated all

18   that.  They're all -- I have those.  Thank you for getting

19   them ahead of time.  I all have them here.

20         So I don't -- you can refer to them, but I don't

21   need to hear that same thing from those same people, unless

22   the person wants to.

23         MS. HARRELL:  Yes.  Understood.  It's something in

24   addition to that, Your Honor.  And for the record, I don't

25   believe any of the actual victims are in attendance today.

1          THE COURT:  Okay.

2          MS. HARRELL:  However, the families of minors 1,

3   4, 5, 7, 9, and 10 are all here in attendance today.

4          THE COURT:  1, 4 --

5          MS. HARRELL:  5, 7, 9, and 10.

6          THE COURT:  Okay.  Thank you.

7          MS. HARRELL:  Yes.  Your Honor, so, I want to

8   start off by talking about what struck me in reading the

9   defense's sentencing filings and really the collection of

10  letters that were submitted on behalf of Mr. Wolf that

11  talked so much about his character.

12          And what struck me and immediately came to mind is

13  that character is not what someone does, presents to their

14  family and friends on a daily basis.

15          The true test of a man's character is what he does

16  when no one is watching.  That's what John Wooden has had to

17  say about character.

18          And what did Mr. Wolf do when no one was watching?

19  After already 20-some years ago, starting his collection of

20  child pornography, he chose to enter a profession where he

21  surrounded himself every single day with the exact age range

22  of boy students to whom he was most sexually attracted.

23          Years before meeting Mr. Strange online in 2020,

24  he began -- at least as far as the Government knows, because

25  the evidence in the case is what comes from the FBI's

1   ability to extract some of his Telegram communications from

2   his cell phone.

3            But at least as early as March of 2018, over two

4   years before he met Mr. Strange online, Mr. Wolf was

5   communicating on Telegram with his associates, his other

6   child predators throughout the country about their shared

7   interest in the sexual abuse of young boys.

8            It struck me in reading the defense's filings that

9   I don't think a single letter was submitted on his behalf

10  from someone who's a peer, not a family member, a cousin, a

11  friend of one of his parents.

12           And I understand that this is a very difficult day

13  for all of those people who have, by all accounts, you know,

14  had contributed to his excellent upbringing, all of the

15  opportunities he's had.  I understand it's a difficult day

16  for all of those people.  But not a single letter submitted

17  from a peer.

18           And frankly, I would submit that's because Mr.

19  Wolf's peers, his friends, were these Telegram associates.

20  And who were they?

21           Well, we know one of them was Alden Bunag, who was

22  a teacher, a middle school teacher in the district of Hawaii

23  where he's been charged.

24           He was someone who also shared Mr. Wolf's sexual

25  interest in his own students, and actually, sent Mr. Wolf

1   years ago, a video of himself sexually abusing his own 13-

2   year-old student, to which Mr. Wolf responded with glee that

3   he appreciated not just receiving the video, but knowing

4   that there might be an opportunity for him, someone like him

5   to have sexual contact with a 13-year-old.

6          He would just have to find a 13-year-old to fuck,

7   not to use my words, but Mr. Wolf's words.

8          Another one of Mr. Wolf's Telegram associates,

9   also identified through a lead generated out of FBI

10  Philadelphia, who has done, as they always do, but in this

11  case in particular, has done tremendous work, not just in

12  making sure that Mr. Wolf is held accountable for his

13  conduct, but in making sure that some of his other

14  associates have been charged -- identified, charged in other

15  districts, and will be held accountable for their conduct as

16  well.

17         One of those other associates who Mr. Wolf was

18  communicating with for years before meeting Kray Strange on

19  Telegram was Daniel Dasko, also known as Mr. Pickles,

20  another teacher and youth hockey coach, who's now charged in

21  the Southern District of California.

22         Again, someone who Mr. Wolf bonded day in and day

23  out with over their shared sexual interest in their own

24  students and their own players.

25         There are others, a youth baseball coach who's yet

1  to be identified, and others who Mr. Wolf communicated with

2  day in and day out.

3          He was working a full-time job as a teacher well

4  before the COVID pandemic and spending nearly every day

5  communicating with these individuals online about their

6  shared sexual interest in children, trading child

7  pornography, which, of course, as the Court knows, re-

8  victimizes those children who are depicted in those images

9  each and every time their images are traded.

10          Because that's yet another distribution of the

11 memorialization of those children's sexual abuse at the

12 hands of adults like Mr. Wolf.

13          Those were his peers, Your Honor, and certainly

14 not people he would want to submit character letters on his

15 behalf.

16          So, years before meeting Mr. Strange, that's what

17 he was involved in.  With these other associates, Mr. Wolf

18 had already started to not necessarily commit crimes, but

19 certainly crimes related to his own students.

20          He was committing crimes with his exchange, his

21 trading of child pornography, but he had already started to

22 escalate to focus his sexual attraction onto the children

23 that he had daily access to.

24          He started out by sending innocent school photos

25 of some of these kids, the boys he liked most, to these

1    Telegram associates, talking about how much he would love to

2    see his eighth-grade students engage in sexual conduct with

3    fifth graders at the school.  And going so far as to pair

4    off some of those children by name to his associates.

5            He started distributing what I would describe as

6    surreptitious photos of these children, not pornographic,

7    but photos that Mr. Wolf took sometimes without their

8    knowledge in his class, on field trips, much like the photo

9    in the defense's filing of Mr. Wolf starring in his high

10   school drama performance.

11           That is a photo just like what he might send to

12   one of his Telegram associates, describing the boys in the

13   photo and talking about his sexual interest in some, one, or

14   all of them.

15           Before meeting Mr. Strange online, Mr. Wolf had

16   already begun, before the COVID pandemic, discussing with

17   one of his Telegram associates about how he was grooming a

18   10-year-old student at recess by skipping his own lunch

19   period at SCH to attend the elementary school recess period,

20   where he then isolated this little boy in the woods away

21   from the other kids at recess, away from the supervisors,

22   and started talking to him, manipulating him, to use Mr.

23   Wolf's own words as he described his conduct to one of his

24   associates, when he thought no one was watching.

25           Talking about how he would get the child alone,

1    but didn't quite know how to escalate things, again, to use

2    Mr. Wolf's words.

3             Ultimately, with one of these associates, he

4    developed a plan to escalate things, to talk to the child

5    about how he, in yet another place in his life where he had

6    almost unfettered access to the exact age range of children

7    that he was most sexually attracted to, coached baseball at

8    the school.

9             And this child, an aspiring baseball player,

10   perhaps Mr. Wolf could get the child to show him his ab

11   muscles and lift up his shirt.  Perhaps when he did that, he

12   could brush his hand over the child's penis, and so on.

13            That's what Mr. Wolf was doing before he even met

14   Kray Strange.  And fortunately, for that child, the COVID-19

15   pandemic shut down the schools in March of 2020.

16            In March of 2020, when the COVID-19 pandemic hit,

17   it made each and every one of the victims who were

18   identified in this indictment even more vulnerable to Mr.

19   Wolf's predatory actions.

20            These kids were online all the time.  They were in

21   online school.  They were in online communication with their

22   closest friends, real friends, with their closest family

23   members outside of their nuclear families.

24            And that kind of online contact and online way of

25   meeting friends was even more normalized when these kids

1   were isolated from in-person interaction.

2          And when Mr. Wolf met Mr. Strange online, which is

3   when the conduct that's charged in the indictment really

4   begins, in May of 2020, Mr. Wolf had taken the opportunity

5   to go where he had support, to travel to Florida to live

6   with his parents for a period of a few months, where he

7   could teach his virtual classes from there, giving his

8   parents an opportunity, as they wrote in their letters, to

9   see what kind of a teacher he was really like on video

10  during the day.

11         And by night -- I don't know when the man slept

12  because he was engaging in chat after chat after chat,

13  picture after picture exchanged with Mr. Strange and these

14  others.

15         I attached as Exhibit C to the Government

16  sentencing memorandum -- what sounds long at almost 100

17  pages of chats between Mr. Wolf and some of these other

18  individuals, it's less than 1 percent of the communications

19  that Mr. Wolf had with these other men online.

20         And it is the crime, it is the insight into Mr.

21  Wolf's mindset, his sexual interests.  It's exactly what he

22  was doing when he thought no one was watching, was this,

23  this criminal child exploitation.

24         So, when Mr. Wolf and Mr. Strange met, while Mr.

25  Wolf had the fortune to be living with some people in his

1  support system, Mr. Wolf, I would submit, viewed Mr. Strange

2  as a sort of a fan.

3          And in fact, Mr. Strange, lying about his own

4  identity, presented himself to Mr. Wolf as a child.  He told

5  Mr. Wolf he was only 16 years old, which was not true at the

6  time, but was what Mr. Wolf presumably believed at the time.

7          Mr. Strange found Mr. Wolf as a result of reading

8  some of Mr. Wolf's erotic stories, which I believe are

9  described to some extent in one of the psychological

10  reports.  Mr. Wolf self describes the kind of fiction that

11  he was writing.

12          Well, that fiction wasn't about this kind of --

13  you know, I think in one of the defense's letters, this, you

14  know, love who you love and accept others for who they love

15  kind of mentality, that's not what we're talking about.

16          We're talking about someone who preyed on children

17  because those are the people he was sexually interested in.

18  And with these stories, he wrote about the rape of boys by

19  adults.  And that's what drew Mr. Strange to Mr. Wolf.

20          So, they begin their relationship, for lack of a

21  better word, their friendship, and for months, trading child

22  pornography, talking about Mr. Strange's efforts to bait or

23  catfish boys, which he had, apparently, great success in

24  doing, far more success than one of the other men Mr. Wolf

25  maintained his Telegram association with, who he, Mr. Wolf,

1  had previously provided social media handles of some of his

2  students, information about those students to target,

3  information as sick as it is, not drawing a single line at

4  family even, information about one of his own nephews too.

5          But that person had not been successful.  Mr.

6  Strange, however, was a different story.  And Mr. Strange

7  presented the opportunity for Mr. Wolf to get directly

8  involved online with the victimization of children.

9          In terms of the indictment and the conduct alleged

10  therein, they started with Minor Number 8, who was not one

11  of Mr. Wolf's students, but a child who lived in Oregon at

12  the time.

13          And Your Honor received a lovely, heartbreaking

14  letter from that child's mother, who described her son, even

15  before the pandemic, as someone who suffered from

16  significant anxiety, didn't have a lot of friends, all of

17  which were exacerbated by the pandemic.

18          And that child believed, like every other boy in

19  this indictment, every other child that Mr. Wolf victimized,

20  that child believed that he was communicating with two girls

21  about his own age, Mr. Strange and Mr. Wolf, who were his

22  friend, who liked him, who cared about him.

23          Their relationship over the course of months

24  became sexually charged online and Mr. Wolf, not only in

25  direct communication with this child via Instagram,

1    soliciting that child to produce sexually explicit images of

2    himself, Mr. Wolf attempted to take it even further after

3    developing the trust of this child, developing a bond with

4    him as some kind of, you know, Ashley, his friend.

5          He attempted to take it even further by coercing

6    this child to sexually abuse his own little brother while

7    his little brother slept.

8          Fortunately, for that child, that family, and that

9    mother, that kid drew the line at that and told Mr. Wolf he

10   would not engage in such behavior, but did send Mr. Wolf

11   pictures of his brother in the bathtub, in bed asleep, and

12   so on.

13         That's the kind of thing Mr. Wolf was doing when

14   he thought no one was watching.

15         And then he and Mr. Strange decided to target Mr.

16   Wolf's own students.  They started with Minor Number 1,

17   who's the minor that you received a letter from.

18         He's older than most of the other kids in the

19   indictment.  He is -- I mean, he's doing so great.  He's in

20   college.  He is obviously still struggling with this.

21         And you read in his letter about how crushed he

22   was to find out that the person behind the scenes who he

23   believed was a girl, two girls, again, like they had done

24   with Minor 8, who were his friends, was actually one of his

25   most beloved teachers, Mr. Wolf, who he had continued to

1    maintain some kind of mentor role model relationship with

2    after no longer being in his class.

3              That crushed that child so much so that he can't

4    study one of the subjects that he was most interested in.

5              That's where Mr. Wolf and Mr. Strange started with

6    victimizing Mr. Wolf's own students.  But that was not

7    enough for Mr. Wolf.  He needed to get to the younger

8    students.

9              And to do so, he created this -- what can only be

10   described as a calculated malicious spreadsheet of potential

11   victims for Mr. Strange to target.

12             And I know Your Honor has seen that as well and it

13   speaks for itself.  But any single child, any student at

14   that school, current, former, or would be, could have been

15   Mr. Wolf's victims because that's what he wanted.

16             THE COURT:  Were all those students in the school

17   -- all those people in that Google Doc students at the

18   school?

19             MS. HARRELL:  Yes, Your Honor.  And --

20             THE COURT:  But not -- but was it every fifth,

21   sixth and seventh grader or was it just selected students,

22   do you understand?

23             MS. HARRELL:  It was not every single one.  Your

24   Honor knows it's an all-boys middle school.

25             THE COURT:  Yeah.

```
 1              MS. HARRELL:  It was many of the boy students in
 2   each of those grades --
 3              THE COURT:  Okay.
 4              MS. HARRELL:  -- fifth through ninth grade.  But
 5   it was not every single one because Mr. Wolf went to great
 6   lengths to --
 7              THE COURT:  That why number 8 is not in that
 8   spreadsheet.
 9              MS. HARRELL:  Number 8 was not a student at the
10   school, Your Honor.
11              THE COURT:  I didn't know that.
12              MS. HARRELL:  Correct.  Yes.  So he is not in
13   there, nor is Minor 1 --
14              THE COURT:  Right.  He's too old.
15              MS. HARRELL:  -- because he was too old.  Nor is
16   one of the other minors.  And in fact, in later Telegram
17   communications between Mr. Wolf and Mr. Strange, after
18   receiving some of the sexually explicit videos that they
19   enticed Minor 4 to create, they discussed how Minor 4 hadn't
20   originally been on their spreadsheet and needed to be added
21   because now he would be a victim as well.
22              And with this spreadsheet, not only did Mr. Wolf,
23   I mean, continue to gratify his own sexual interests day in
24   and day out, but made it a game.
25              And that is yet another -- I mean, that's an
```

1   extra, almost sadistic element of this case, is the fact

2   that he organized this list of potential victims using some

3   of the children's school photos that he had access to by

4   virtue of being a teacher at the school.

5           And he gave a list of -- a hit list of victims to

6   Mr. Strange with 78 children on it.  So, once he provides

7   that spreadsheet to Mr. Strange, that's when their real

8   success, for lack of a better word, in victimizing Mr.

9   Wolf's students, begins.

10          And Mr. Strange was very successful and Mr. Wolf,

11  we see his conduct escalating.  Not only is he having these

12  communications almost all night, every night, with Mr.

13  Strange and others, because he's maintaining his

14  communication with his other associates, his other Telegram

15  buddies, including sending some of the videos of his own

16  students he's receiving to some of these other sexual

17  predators around the country.  He's starting to --

18          THE COURT:  Counsel, when you send those photos --

19  when he sent the photos, is it your understanding that they

20  would also identify that?  Because he's not writing Minor 2

21  and Minor 2.

22          MS. HARRELL:  Correct.

23          THE COURT:  Is he identifying by a kick name or by

24  whatever it is, knock name or whatever?  I saw the chart.

25          MS. HARRELL:  Yes.  He would often --

1          THE COURT:  So, if I was -- so, then if a predator

2   sitting in Hawaii wanted to, he could find the same person?

3          MS. HARRELL:  Yes, Your Honor.  And --

4          THE COURT:  The same child?

5          MS. HARRELL:  Yes.  Sometimes using their social

6   media handles, sometimes using their first name, sometimes

7   their full name.

8          I mean -- and clearly, Telegram is used by people

9   like Mr. Wolf because they believe that due to its end-to-

10  end encryption and Telegram's refusal to cooperate with law

11  enforcement in terms of providing any content, that these

12  messages would never be recovered or discovered by law

13  enforcement, certainly by his close friends and family.

14         He concealed this behavior from everyone in his

15  life.  But this was his -- this took up a huge amount of his

16  time.  And he wasn't only doing it at night, he was engaged

17  in this while at school even.

18         And I'm sure Your Honor recalls from the

19  Government sentencing memorandum the discussion that Mr.

20  Wolf and Mr. Strange had specifically about Minor 10, who

21  was physically in Mr. Wolf's classroom at the time when Mr.

22  Strange contacted him via Snapchat, again, as this young

23  teen girl that these boys think they're friends with, who is

24  distributing sexually explicit photos of young girls, yet

25  another class of victims in this case that really gets lost.

1          The little girls, young girls that Mr. Wolf and

2    Mr. Strange redistributed images of in order to assist their

3    enticement efforts.

4          But while Minor 10 is sitting in Mr. Wolf's class,

5    Strange is encouraging him, at Wolf's direction, to go to

6    the bathroom to see if they can get the child to produce

7    images of himself while he's actually in school.  And of

8    course, that arouses Mr. Wolf to no end.

9          The child did not send any images at that point in

10   time, but Mr. Wolf's conduct was not separated at all from

11   his teaching.  It was completely intertwined in terms of his

12   selection of victims, in terms of his sexual interests, in

13   terms of even when he was engaged in some of the criminal

14   conduct on the school's property.

15         The Defendant's criminal conduct was undeterred,

16   as I've discussed, by the supportive factors in his life.

17   And it continued even after the Defendant had gone to great

18   lengths to father a child using a surrogate.

19         As a single father to a newborn baby, the

20   Defendant was literally taking care of the baby in one arm,

21   feeding her, soothing her, while holding the cell phone,

22   viewing and exchanging, trading child pornography, baiting,

23   catfishing his students, sometimes lamenting the fact that

24   he couldn't so easily view the videos with just one hand

25   because the baby was in the other.

1            That's who Mr. Wolf is.  He is not an excellent

2    teacher.  He is not an excellent father.  He is a child

3    predator and the community must be protected from him.  And

4    that is why the Government is asking for a life equivalent

5    sentence.

6            The Defendant's crimes that he's charged with in

7    this indictment and that he pled guilty to are the most

8    egregious aspect of his conduct for sure, but they only

9    scratch the surface of his involvement in this child

10   exploitation world in which he was deeply, deeply

11   entrenched.

12           And even today, Mr. Wolf -- of course, he's

13   accepted responsibility by pleading guilty, but he continues

14   to deflect responsibility, blaming Mr. Strange when he

15   speaks to both Dr. Somerton and his own psychological

16   expert, for getting him to the place where he was committing

17   these crimes.

18           Well, frankly, Mr. Strange's involvement only

19   facilitated his successful completion of these crimes.  He

20   was already well entrenched in this before meeting him.

21           He blames the COVID pandemic for isolating him,

22   for causing him to get involved in this, but he was already

23   doing this for years before that.

24           And with those kinds of statements, the Defendant

25   demonstrates, as Dr. Somerton described, a real lack of

1    insight or recognition into his motivations for committing

2    these crimes.

3            He has no idea why he would target his own

4    students, but he's certainly interested in learning why.

5    That is ridiculous.

6            He targeted his own students because he was

7    sexually attracted to them and he enjoyed this kind of, I

8    mean, taking it to the next level of beyond just fulfilling

9    the sexual attraction, but the trickery component of it.

10           Because, of course, these children are not going

11   to be sending sexually explicit images of themselves to

12   their teacher.

13           And I'm going to give the victims' parents who

14   want to speak an opportunity to do so, and they will discuss

15   the impact on themselves, on their children, on the

16   community far better than I could ever do.

17           But that's what happened to these kids when they

18   found out that Mr. Wolf was behind the phone.  They didn't

19   view themselves as victims.

20           And then they found out their teacher was their

21   friend Ashley or Leslie online.  And their entire worlds

22   have changed as a result forever.  And that's the impact Mr.

23   Wolf has had on the community and on these children.

24           So, Your Honor I would like to give -- I know the

25   mother of Minor 5 would like to address the Court, so I

1   would like to --

2           THE COURT:  Can I have a question before you --

3   can I have a question for you, please?

4           MS. HARRELL:  Yes, please.

5           THE COURT:  The chronology strikes me because it's

6   a little bit -- there's so much, I'm missing the chronology.

7           MS. HARRELL:  Yeah.

8           THE COURT:  I understand the COVID issue.  Okay?

9   But there's a statement in your memorandum, two things that

10  aren't directly charged, but I believe are relevant conduct.

11          And one is the masturbating and the boys

12  underpants on an overnight trip.  That had to be before

13  COVID.

14          MS. HARRELL:  Yes, Your Honor.

15          THE COURT:  That's not one of these boys, right?

16          MS. HARRELL:  Not as -- no, Your Honor.  It was

17  not one of the boys.  So that was something that Mr. Wolf

18  bragged to one of his Telegram associates about doing on an

19  overnight school trip.

20          THE COURT:  Approximately when, do you know?

21          MS. HARRELL:  I would say approximately 2018,

22  perhaps 2017, depending on --

23          THE COURT:  Okay.

24          MS. HARRELL:  -- if he was talking in the past.

25          THE COURT:  Okay.  Second one referenced came from

1    the text messages -- or excuse me, Telegram messages.  Was

2    the idea how he was -- the boy with the pelvic -- you know,

3    strong pelvic muscle.  He didn't know what it was, right?

4              MS. HARRELL:  Yeah.

5              THE COURT:  Strong pelvic muscle.  And he reached

6    down and actually grazed his penis.

7              MS. HARRELL:  Yep.

8              THE COURT:  And he apologized and he -- and in

9    fact, he said this is why it's illegal.

10             MS. HARRELL:  Yes.

11             THE COURT:  When is that?  Is that --

12             MS. HARRELL:  That --

13             THE COURT:  COVID is March of 2020.  It has to be

14   before that?

15             MS. HARRELL:  That was in January and February of

16   2020 when he was --

17             THE COURT:  Right before the pandemic?

18             MS. HARRELL:  Yes.  And that's based on -- that

19   timeline is based on Mr. Wolf's own statements about that to

20   his Telegram associate.

21             THE COURT:  Oh, I see.

22             MS. HARRELL:  Because those statements were being

23   made in January and February of 2020.  And you can see, as I

24   hope I outlined well enough in the memorandum, how it

25   evolves.

1                It starts with discussing that child, then

2     discussing what happened at recess one day, then discussing

3     the plan to escalate things.  So --

4                THE COURT:  Does it strike you as odd doing so

5     many of these cases in your experience and your expertise

6     that we go from touching.  The way I've seen these cases is

7     they graduate from photos to hopeful personal gratification,

8     touching on.

9                MS. HARRELL:  Yeah.

10                THE COURT:  It seems this one goes the other way.

11     Or is that -- why is that?  Why is it seems there's touching

12     and the --

13                MS. HARRELL:  Yeah.

14                THE COURT:  And then is it the pandemic or what?

15     Is there any graduation to touching --

16                MS. HARRELL:  Well --

17                THE COURT:  -- going on after the catfishing

18     scheme?

19                MS. HARRELL:  Not as far as we know, Your Honor.

20     And certainly, prior to those statements that Mr. Wolf made

21     to his associate about his conduct with the 10-year-old

22     little boy, he was trading child pornography.  He was doing

23     all of that.

24                THE COURT:  Right.

25                MS. HARRELL:  So, I would submit that in this

```
 1   case, Mr. Wolf -- I mean, to his credit, there has not been
 2   -- that child did not -- has not disclosed sexual abuse, nor
 3   has anyone else.
 4             THE COURT:  Which child?  The pelvic bone child?
 5             MS. HARRELL:  Yes.
 6             THE COURT:  That's not one of these boys.
 7             MS. HARRELL:  He's not, Your Honor.  No.  He has
 8   been identified by the FBI and his parents have been --
 9             THE COURT:  Okay.  But he's not part of the
10   indictment?
11             MS. HARRELL:  Correct.  He's not part of the
12   indictment, Your Honor.
13             THE COURT:  Okay.
14             MS. HARRELL:  I mean, I would submit that Mr.
15   Wolf's whole profile, if he were to have a hands-on victim,
16   which is what Your Honor's asking, it would have to be a
17   younger child that he could manipulate or a child on one of
18   these overnight trips who is perhaps questioning his own
19   sexuality, who he could ply, if he wanted to, with drugs,
20   alcohol, and so on, to make that child complicit.
21             THE COURT:  Playstation crimes.
22             MS. HARRELL:  Yes, exactly.  The play --
23             THE COURT:  So, what is the -- tell me -- give me
24   the timing of the boy in the walk in the woods.  When is
25   that?  Because that's -- you know, I'm trying -- escalate is
```

```
 1    the word he uses.  I'm trying to --

 2              MS. HARRELL:  Yes.

 3              THE COURT:  I touched him on his shoulder, I

 4    touched him on his hand.

 5              MS. HARRELL:  Right.  That would've been --

 6              THE COURT:  When is that?

 7              MS. HARRELL:  That would've been in early 2020

 8    before the pandemic started.  That's why I say, fortunately,

 9    for that child, the COVID pandemic closed down the schools.

10              THE COURT:  Okay.  All right.  I'll hear from

11    anybody who wishes to, please.

12              MS. HARRELL:  Okay.  Your Honor, I would like to

13    call Minor 5's mother.

14              THE COURT:  Number 5?

15              MS. HARRELL:  Yes.  Would you like her at the

16    podium, Your Honor?

17              THE COURT:  Wherever she's most comfortable.  As

18    long as I can hear her, that's fine.

19              MS. HARRELL:  Yeah.  Yeah.  Is it okay if -- you

20    want to sit?

21              THE WITNESS:  I'll sit, stand, whatever.

22              MS. HARRELL:  Okay.

23              THE COURT:  It's fine.  Whatever you're most

24    comfortable.

25              THE WITNESS:  Thank you.
```

```
 1              MS. HARRELL:  Yeah, you can.

 2              THE COURT:  As long as Mr. Wolf and his counsel

 3    and I can hear you.

 4              MS. HARRELL:  Do you want her sworn, Your Honor?

 5              THE COURT:  Yes, please.  Thank you.  I'm sorry.

 6    Thank you.  Yeah.

 7              THE CLERK:  State your name for the record.

 8              MS. HARRELL:  And, Your Honor --

 9              THE COURT:  Wait.  Hold on.  Hold on.  Hold on.

10    Just say your first name.  Just use your first name and the

11    initials of your child.  The first name.  Is that okay?  The

12    first --

13              MS. HARRELL:  Can we just do her perhaps the

14    mother of Minor 5 and her first name?

15              THE COURT:  That's fine.

16              MS. HARRELL:  Okay.

17              THE WITNESS:  My first name is Diana, D-I-A-N-A,

18    and I'm the mother of Minor 5.

19              THE COURT:  Thank you.

20              THE CLERK:  Do you swear that the testimony you

21    shall give the court shall be the truth, the whole truth,

22    and nothing but the truth, so help you God?

23                   DIANA, PLAINTIFF'S WITNESS, SWORN

24              THE WITNESS:  I do.  Do you mind if I sit down?

25              THE COURT:  Whatever you wish.
```

```
 1              THE WITNESS:  I just -- yes.  Thank you for
 2    allowing me the opportunity to give this victim impact
 3    statement regarding Mr. Wolf at the risk of reopening wounds
 4    that are in the process of healing and making myself very
 5    vulnerable by sharing intensely personal experiences of my
 6    family.
 7              I know that hearing from us about how these crimes
 8    have impacted us will help Your Honor give him an
 9    appropriate sentence.
10              And that's the only reason that I'm willing to
11    share the personal torment that we've been going through for
12    the past 15 months.
13              I just want to say thank you to the FBI agents
14    who've worked on this case, and, of course, Ms. Harrell.
15    Their commitment and dedication to doing this type of work
16    is not lost on me.
17              It's hard and I know the toll that it takes and I
18    can't thank them enough for their patience and all the work
19    that they've done to help the families get through this
20    process.
21              And I'm forever grateful to them and to -- thank
22    you.  To Agent Schreyer (phonetic), especially, for
23    insisting that I was not entitled to see the discovery
24    related to my son, despite my multiple requests to do so and
25    my assurance that I could handle it.
```

1          Knowing everything I know about this case now, I

2   know for sure that I could not have handled it.

3          And I only recently decided to speak today because

4   it's very hard to be here and put my son's personal identity

5   out to the entire Chestnut Hill Academy community.

6          And not only is it hard for me to put myself out

7   here, it's hard for the other families who are all here

8   despite knowing that being here is going to identify them in

9   the community.

10          But I wanted to do so anyway because I know how

11   important it is to hear directly from victim's families

12   about the impact.

13          But even more so, Your Honor, is knowing -- I read

14   the plea agreement and I know what happened in this case to

15   my son's friends.

16          And it is another trauma to walk in that door this

17   morning and see the faces of -- essentially, I'm looking at

18   the children when I see their families.  We are a small

19   community.  We've gone to school together since our children

20   were four years old in pre-K.

21          And knowing that the other kids are involved, it's

22   another traumatization that we are all here feeling right

23   now.  And it's the reason why a lot of us probably aren't

24   here.

25          And it's not because they're not interested or not

1    because they're not tremendously impacted by this, but it's

2    because it's really hard to go through what we went through,

3    now have our identities put out into the public basically.

4              And also, to be re-traumatized by knowing that

5    kids that I love and that I've loved since they were little

6    are involved in this.

7              But being here to exercise our rights for some of

8    us and others of us who can't is just another thing that

9    he's taken away from us.

10             But I'll tell you about my son.  He's the kind of

11   kid who never had a bad day before his freshman year of high

12   school.

13             He's always been a leader at the school.  He was

14   popular with everyone.  He was the class speaker for the

15   eighth-grade graduation and he was voted as such by his

16   peers.

17             And in his speech, he talked about how much the

18   school meant to him and how his teachers have made such a

19   huge impact on all of the kids' lives and how lucky they

20   were to be at a school where the teachers cared so much

21   about the students.

22             At the time, we had no idea that Mr. Wolf would be

23   one of the greatest impacts on them, and not because he

24   taught them math.

25             I look back on photographs that I have in my phone

1    from that day of graduation and I remember it quite clearly

2    that I saw Mr. Wolf with his daughter, his newborn daughter,

3    and all the parents and all the kids gathered around

4    offering their congratulations.

5          All the while, he went home and he was looking at

6    our children naked after using the private information that

7    he had about them to gain their trust, to satisfy some

8    deviant sexual proclivities that he has.  And then he

9    invited a stranger onto our campus to do the same.

10          When we first heard about his arrest, so many of

11   the kids asked about what was going to happen to his

12   daughter, what was going to happen to her.

13          They had compassion for her.  And little did they

14   know they were the victims.  Our children were the victims

15   and they were the ones that were exploited and violated.

16   Our lives will never be the same.

17          When we became aware of our son's involvement in

18   November of 2021, we debated even telling him that he was

19   involved because I know particularly what it means to open

20   the door of being a "victim."

21          But knowing that other kids would know of their

22   own involvement and knowing that our son would figure out

23   that he was involved because all the kids talked about this

24   Leslie person and Alex and Ashley trying to contact them.

25          So, we told him.  And we wanted to try to lessen

1   the shame and trauma and stress that he may have felt by not

2   knowing if anyone would find out that he was involved.

3           His first response was to be filled with shame.

4   He worried about how this is going to impact him for the

5   rest of his life.

6           Who has the picture besides my teacher and his co-

7   conspirator?  Did they sell them?  Did they give them to

8   pedophiles around the world?  Who saw this picture?  Is it

9   going to spread around school?  Are other teachers going to

10  know?  Other kids?  Am I in any trouble?

11          And probably worse for him was the knowledge that

12  I had told him from the time he was little not to do this

13  kind of thing.

14          And it's hard for a 13-year-old, which was how old

15  my son was when this happened, to do the things your mom

16  tells you not -- you know, when you do the things your mom

17  tells you not to do, to have to live with that is difficult.

18          And I want to tell you how shame and betrayal and

19  the violation can impact somebody because you never know who

20  you're going to affect.  And in a million years, I never

21  thought that my son would be affected the way he was

22  affected.

23          He spiraled into depression and self-harm to deal

24  with his feelings of shame, self-blame, fear, sadness,

25  embarrassment, anxiety and betrayal.  He began cutting his

1   arms to deal with the emotions that he'd never really had

2   before.

3           The day after telling him about his involvement in

4   this, he cut his arms with a razor blade 20 times on each of

5   his forearms.

6           He used -- he took the blade out of a cheap Bic

7   type razor, and it was months before I figured out exactly

8   how he did that.

9           So, eventually, we had to lock up every cutting

10  instrument in our house, including knives, scissors,

11  anything.  But he would figure out a way to use everyday

12  items around the house to get the job done.

13          We put him in intensive outpatient therapy in

14  December of 2021.  But so -- and that was around the

15  Christmas holidays and he came to me and told me that he

16  wanted to talk to the FBI.

17          He wanted to help make sure that Mr. Wolf and Kray

18  strange are punished for what they did to both him and his

19  friends.  And he wanted to make sure that he'll never be

20  able to do this to another kid again.

21          And he also said that he wanted to make sure that

22  his friend -- he didn't leave his friends out to dry.  He

23  wanted to be with them because he knew that other kids were

24  involved and wanted to help make their cases stronger.  His

25  sense of wanting to protect other people is always

1   remarkable.

2           He even in fact tried to persuade some of his

3   friends not to accept friend requests from this Leslie and

4   Alex person because he knew after sending the picture that

5   he sent that something wasn't right and he ended up blocking

6   them so that he didn't have a lot of involvement in those.

7           Shortly after making the call to the FBI and

8   setting up the appointment to speak to the forensic

9   interviewer, he cut again, 20 to 30 cuts on each arm.  And

10  then after the interview, he did the same thing.

11          And at that point, we took him out of intensive

12  therapy and put him in a partial hospitalization program,

13  which turned out to be a disaster.  It was completely

14  unhelpful.

15          And when he walked out of there, he looked at me

16  and said, "I think I'm going to need to go to residential.

17  This isn't working."

18          We continued to try to find appropriate trauma

19  related therapies for him, but it's not as easy as it

20  sounds, even though we have resources and insurance.

21          It was still sort of the pandemic and places were

22  just full and we had fights with insurance companies.  We

23  were on wait lists, we had all kinds of issues with that.

24  And my son continued to deteriorate.

25          And on Wednesday, February 23rd, I got a call from

1   one of the parents of one of my son's friends.  It was at

2   night.

3           And she told me that my son had told her son that

4   he can't take it anymore and he's planning to take all of

5   his medication.

6           And I caught him on the way downstairs and stopped

7   him from taking an entire bottle of medication because he

8   can't deal with the shame.

9           We took him to the emergency room and he went to a

10  hospital where he spent the next week getting stabilized on

11  new medication.

12          He was transported in a ambulance.  He was taken

13  hours away because there were no beds available.  It was in

14  a different state.

15          It was during COVID and I couldn't visit him.  He

16  saw things at that hospital that will live forever in his

17  memory and he won't even talk about it.

18          At the time, it was the best place for him, but it

19  was horrendous.  And leaving him there was the most

20  difficult thing I've ever done in my life and I hope I never

21  experience that kind of fear, helplessness, and sadness ever

22  again.

23          Your Honor, I have photographs, because I don't

24  know if you know what it looks like to see a 14-year-old boy

25  in a hospital after he's tried to kill himself.  And I want

1   you to see what that looks like because it's horrible.

2          There's a picture in the emergency room and

3   there's a picture of him in the waiting room to get sent to

4   a locked ward to make sure that he stays alive.

5          I want him to see what that looks like and replace

6   in his mind the pictures you have in your head that you

7   stole from our children with the picture of what it looks

8   like when you do something like that to another child.

9          This is what I want you to remember.  Not whatever

10  it was that he stole.  That is what shame, betrayal, and

11  humiliation felt like, that the only way to solve that is to

12  die, all because of what your math teacher did.

13         After the stay in the hospital, he began new

14  therapy that we paid for out of pocket.  He swore he never

15  wanted to go back to the hospital and he would never cut or

16  think of suicide again.

17         But that didn't last long.  He spent spring and

18  summer trying very hard to act like things were fine when

19  they were anything but.

20         I brought a photograph, Judge, of what it looks

21  like when you take a razor blade to your forearm and carve

22  the word worthless into your skin.

23         When you cut your skin, it causes a scar.  And

24  this is the physical scar of what was done to my child,

25  worthless on his arm, for the rest of his life.

1           And that's not even the worst picture.  I remember

2    being here at the guilty plea, Your Honor, and you asked

3    him, Judge, how he felt.

4           And he told you that he was not suicidal.  And I

5    thought, wow, how lucky?  My son is a victim of those crimes

6    and he's suicidal and you are not.  How lucky?

7           And eventually, in the summer of last year, 2022,

8    he went to a residential place in August, again out of

9    state, many, many miles away, hours of driving.  We dropped

10   him off and within days, we went back.

11          He was there with kids who drank hand sanitizer,

12   choked themselves out to get high, and he was involved in a

13   verbal altercation that led to a physical act of violence

14   against him when someone threw him to the ground because my

15   son was doing what he does all the time, which is standing

16   up for bullies, like he always did.

17          Finally, after trying so many different things, we

18   found the right place for him.  And finding the right place

19   for him meant taking him out of the school where he had been

20   since 2011 when he was four years old, and he hasn't been

21   back to Springside Chestnut Hill Academy this year.

22          Once the pressure of not having to attend school

23   where this ordeal began, he could focus on himself and his

24   healing.

25          And the program was another partial

1   hospitalization program.  He went every day for seven and a

2   half hours a day for three months.  It was very intense for

3   him and for our whole family.

4         He went to school there, he had individual

5   therapy, group therapy, recreational therapy, art and music

6   therapy.  It was nonstop work for him all day.  Even during

7   the lunch hour.

8         We had family therapy and numerous meetings with

9   the therapy staff.  We drove him there every day.  A 40-

10   minute drive there from my house, and then an hour or more

11   back to the city for work, an hour or more back to pick him

12   up, and then 40 minutes home.  And we did that for three

13   months.

14         Upon discharge, he went to the same place and did

15   intensive outpatient therapy for three days a week and now

16   he sees the therapist once a week.

17         He's on the road to recovery now and is doing

18   really well.  It's been over six months since he's hurt

19   himself and he's focusing on trying to get back to a school

20   next year and trying to put this behind him.

21         Suicide prevention is a very important part of my

22   son's life and he's teamed up with the National Association

23   of Mental Illness and the American Foundation for Suicide

24   Prevention.

25         He's held fundraisers at his gym, he's sold t-

1   shirts, and he's raised over $5,000 for those organizations.

2   His goal last summer was to get the word out about the new

3   suicide prevention hotline, 988, and I'm very proud of him.

4           But honestly, Your Honor, I wish this was not the

5   charity that he chose to make such a big part of his life.

6           The constant worry that I have that this incident

7   will be the thing that sets my child over the edge into drug

8   or alcohol addiction, more suicide attempts, more mental

9   health crises, it's powerful and it's overwhelming, and it

10  seems like the worry for me is never going to end.

11          I live every day with the fear that this is going

12  to be the event that defines my child's life and everything

13  now is before and after.

14          He was a different kid before this happened and

15  there's no doubt that this has changed us forever.

16          I can only hope that -- and pray that the time and

17  energy he's spent now into therapy and healing is going to

18  go a long way to prevent issues from happening in the future

19  had he not dealt with this trauma when it happened.

20          The impact that this has had on the rest of my

21  family cannot be understated.  My son's older brother is a

22  student at SCH as well.  My older son goes into my younger

23  son's room every night to make sure he is still breathing.

24  Every night.

25          It's unimaginable that an 18-year-old kid trying

1   to focus on finishing high school and starting college feels

2   like he needs to make sure his little brother's alive every

3   night.  All because his teacher wanted to satisfy some sick

4   and twisted sexual interest.  And it's -- I can't -- I just

5   can't tell you how unimaginable this entire process is.

6           Again, I was here at the plea and I didn't hear

7   him say he was sorry and I didn't hear him say he's

8   remorseful, and I don't know if he's going to allocute

9   today.  I hear that he is, and I hope that he does.

10          And I can only hope and pray that he is truly

11  remorseful for his actions and that he can eventually get to

12  some true empathy for his victims.

13          I hope he understands the betrayal.  I hope he

14  knows just how impactful.  Even though this has not gone to

15  physical touching, it's almost like it doesn't matter.  The

16  trauma is very similar.

17          And nothing that he can say is going to change how

18  I feel, but it's fair to ask, I think, who he shared these

19  pictures with and how much further could this potentially

20  blow up for us?

21          I feel like in 5 years, in 10 years, I'm going to

22  be getting calls from the FBI that say that my son's

23  pictures have been -- have shown up somewhere again.  But

24  I'll never know.

25          I can only hope that Your Honor gives him a

1   sentence that we don't have to worry about anything like

2   this happening again.

3          I don't want to have to worry about him doing what

4   he said he planned to do in the future, as stated in his own

5   words, discussed -- as Ms. Harrell already told us.  When

6   people tell you who they are, believe them.

7          And I hope that your sentence, Judge, will show

8   our kids and any future kids that could come across his path

9   that they're worth protecting.  Thank you.

10         THE COURT:  Thank you.  Counsel, I have to adjourn

11  for naturalization.  My hope is to be back no later than

12  12:30, but I defer to you if you would prefer to start at

13  1:00 or based on whatever schedule you have, but my hope is

14  to be back as soon as I can.

15         Probably an hour and 15 minutes or so for a

16  naturalization.  I have to get through the shaking hands and

17  all that, take pictures.  Much different environment.

18         So, I defer to each of you.  Would you prefer --

19  is 12:30 okay with you?

20         MS. HARRELL:  12:30 is fine, Your Honor.

21         THE COURT:  I don't want to mess up your day, but

22  does that work for you?

23         MR. DONATO:  Yes, sir.

24         THE COURT:  Okay.  All right.  The court's

25  adjourned to 12:30.  I'll be in the ceremonial courtroom

 1   (indiscernible) today.

 2              Yes, sir.  Mr. Donato?

 3              MR. DONATO:  Your Honor, would you like to know

 4   what we're going to do and how long it's going to take?

 5              THE COURT:  Hold on.  Hold on.  What's your

 6   thought?

 7              MR. DONATO:  The way we plotted this out is -- I'm

 8   glad that the sentencing memorandum was useful to the Court.

 9              THE COURT:  It was.

10              MR. DONATO:  I have to give Ms. Mattes credit for

11   that.

12              THE COURT:  Yes, it was well done.

13              MR. DONATO:  It was collaborative effort, but --

14              THE COURT:  Yeah.

15              MR. DONATO:  -- she did the heavy lifting.  What

16   we'd like to do is --

17              THE COURT:  I knew that.

18              MR. DONATO:  What we'd like to do is have Ms.

19   Mattes address the court first and then I'll have some

20   remarks at the end.  The Government has no objection to

21   that.

22              THE COURT:  If that's okay with the Government,

23   sure.

24              MS. HARRELL:  That's correct, Your Honor.

25              THE COURT:  Fine with me.

1          MS. HARRELL:  That's fine.

2          THE COURT:  Thank you.  All right.  Court's

3    adjourned until 12:30.

4          THE BAILIFF:  All rise.

5          THE COURT:  Thank you very much.

6       (Recess taken from 10:26 a.m. to 12:33 a.m.)

7          THE BAILIFF:  All rise.

8          THE COURT:  Good afternoon.  Please be seated.

9          MS. HARRELL:  Good afternoon, Your Honor.

10         THE COURT:  Express my personal appreciation to

11   counsel and their -- and Mr. Wolf for your kindness and

12   allowing me to welcome 66 members from 33 countries to the

13   United States.  Thank you for your time.

14         United States, we were in your presentation when I

15   had to break to handle the naturalization.  Do you have any

16   further information you wish me to consider other than your

17   papers and what I heard from the mother of Minor Number 5?

18         MS. HARRELL:  Yes.  Just very briefly, Your Honor.

19         THE COURT:  Please.

20         MS. HARRELL:  No other parents wish to address the

21   court, although they've all returned for the second half of

22   today.

23         THE COURT:  Okay.

24         MS. HARRELL:  And as I said before we broke, no

25   one can describe the victim impact in this case better than

1 | the parents of the victims themselves, and what you've heard

2 | in court today and what you've read and the letters.

3 | I did just very briefly want to address two issues

4 | that I didn't speak about before the break.

5 | THE COURT:  Fine.

6 | MS. HARRELL:  One of those is the guidelines and

7 | one is the risk of recidivism, both of which were -- the

8 | defense's sentencing filings devoted quite some time to

9 | addressing.

10 | In terms of the sentencing guidelines, I want to

11 | draw the Court's attention to what the guidelines, while

12 | they call for a life sentence, which can't legally happen in

13 | this case, but the Government is asking for a life

14 | equivalent sentence.

15 | The guidelines, even at the highest range

16 | possible, don't account for several facts present in this

17 | case.

18 | They don't account for all of Mr. Wolf's victims

19 | because the grouping rules are capped at five units, five

20 | victims, when this indictment charges him with crimes, both

21 | in the conspiracy and then in some of the substantive

22 | offenses with crimes against 14 children.

23 | The guidelines don't account for Mr. Wolf's

24 | position as a teacher when he committed these crimes or his

25 | betrayal of the profession.

1          And the guidelines don't account for the other

2    child pornography activity that he was engaged in, the

3    trading, receiving, distributing, and possessing images of

4    other children being abused.

5          So, I would highlight those facts for the Court in

6    making the argument that this is certainly not a mandatory

7    minimum type case.

8          And Mr. Wolf, through his own conduct, the

9    victimization of his own students, the scope and

10   entrenchment of his involvement in the child pornography

11   exploitation world online, and really the victim impact in

12   this case warrants a sentence that amounts to a life

13   equivalent sentence.

14         The Government submits as well that the sentence

15   imposed by this Court, I mean, of course, it will hold the

16   Defendant accountable for his crimes, and it should reflect

17   the conduct in this case and not be based on some predicted

18   future risk of Mr. Wolf's behavior in terms of his

19   likelihood to recidivate in committing these crimes.

20         And of course, as I talked at length before the

21   break, we've seen Mr. Wolf's recidivism over and over and

22   over again in the years leading up to his arrest in this

23   case.

24         I do want to highlight that even the Defendant's

25   own expert, while ultimately concluding that Mr. Wolf, after

1   significant treatment, would pose a low risk for recidivism,

2   describes Mr. Wolf as a man who has been and always will be

3   preferentially attracted to minors.  The attraction is

4   neither treatable nor curable.

5        And with all due respect to Dr. Atkins, in terms

6   of his ultimate conclusion as to Mr. Wolf's risk to

7   recidivate, that is a particularly bleak description of Mr.

8   Wolf's sexual proclivities, and not just the feelings, of

9   course, but the fact that he acted on them in this case over

10  and over again to victimize children.

11       I would ask the Court to give significant credit

12  to the opinion in the report of Dr. Somerton that was issued

13  really at the Court's request.

14       That's the Court-appointed psychologist who also

15  evaluated Mr. Wolf and commented, among other things, on Mr.

16  Wolf's lack of insight and lack of understanding of his

17  motivation to commit these offenses, which represent

18  potentially ominous signs of his inability to refrain from

19  the future victimization of children.

20       And of course, that opinion connects with common

21  sense, the Government would submit.

22       The fact that Mr. Wolf continues to minimize his

23  conduct when speaking to the psychologists, I would submit,

24  is something else that the Court should give great weight

25  to.

1          As the Court noted in your initial comments, Mr.

2    Wolf lied to the FBI at the time of his arrest in October of

3    2021, adamantly denying that he had been or ever would

4    victimize his own students.

5          And since then, I would submit, has, of course,

6    had to admit that, given the weight of the evidence in this

7    case, and did admit that at the change of plea hearing, but

8    continues to minimize the extent of his involvement in this

9    community.

10          He also demonstrates, or at least has demonstrated

11    a real lack of empathy for the victims, telling Dr. Atkins

12    that he never thought he was harming any of these boys

13    because he was only pretending to be a teen girl.

14          And the fact that it took being arrested and

15    having his conduct exposed to alert him to the fact that, of

16    course, he was harming these children.

17          Not just when they found out about his identity as

18    the person behind the Ashley Hamilton girl persona online,

19    but also, he was harming these children by discussing them,

20    by redistributing their images to other predators on the

21    internet.

22          And as the mother of Minor 5 eloquently discussed,

23    those are concerns that will follow these families forever.

24    Where have those photos gone?  Who has them?

25          And frankly, the FBI will never be able to confirm

1    that they have, you know, tracked each and every photo to

2    each and every predator who may have received them on the

3    internet.  And the Government submits that the Court should

4    take that into account.

5           The letters that the Court received in terms of

6    victim impact, of course, the Court knows, and I just want

7    to say that one of the mothers talked about --

8           You know, her son is minor number, whatever, but

9    these kids aren't minor numbers.  They're real kids, who

10   were his real students, who are --

11          I mean, they're sons, they're loved, they're

12   trying to get through a really tough time for anybody,

13   adolescents, during a pandemic, trying to maintain

14   friendships, play on sports teams, do all the normal things

15   that kids are supposed to do.

16          And instead, they're dealing with finding out that

17   Mr. Wolf victimized them online, and many of them deal with

18   every single day walking back into the school where this

19   conduct at least originated from.

20          And I wanted to read just a portion, a very brief

21   portion of one of the letters that was submitted as victim

22   impact.  Because what this case --

23          Mr. Wolf has victimized, not just these individual

24   kids as direct victims, but the entire school community who

25   are indirect victims, all of the kids he taught, their

1    parents, their families, who trusted him with their

2    children's education and wellbeing.  He has broken that

3    trust and truly betrayed his profession.

4           As the mother of one of the children writes, "A

5    teacher-student relationship is unique.  There is a special

6    bond and understanding that forms that allows students to

7    feel safe, supported, and valued.

8           There is a clear understanding that no matter

9    what, the teacher is there to motivate you, support you, and

10   make you a better person.

11          Andrew Wolf's actions fractured the foundation and

12   core values at SCH and left students questioning and feeling

13   that school was no longer a safe space for them."

14          And that's the kind of teacher that Andrew Wolf

15   was.  The teacher who fractured this safe space for children

16   and betrayed his profession.

17          And for all of these reasons, the Government is

18   asking this Court to impose a life equivalent sentence.

19          THE COURT:  I have one question.  Thank you,

20   Counsel.

21          MS. HARRELL:  Yes.

22          THE COURT:  I have one question, maybe two.  Just

23   one, I think.

24          It seems to me from the reports that I read, that

25   there was more -- you suspected there were more pictures and

1    things like this, and you alluded to earlier it.  I don't

2    know, Telegram.

3              But what is the --- what is -- what are your

4    agents telling you is what happened to other items?  In

5    other words, we only know about what's on the phone.  Is

6    that right?

7              MS. HARRELL:  Correct.

8              THE COURT:  I'm not suggesting there's more --

9              MS. HARRELL:  Correct.

10              THE COURT:  -- but there's an illusion in the

11    paperwork that there was more.

12              MS. HARRELL:  Your Honor, so, the way that

13    Telegram -- the evidence came from Telegram in this case is

14    from Mr. Wolf's phone.

15              And within that, the Telegram messages are only

16    maintained within that phone, as I understand it, if they

17    have not been deleted by either side of the conversation.

18              In the messages that were extracted, there were a

19    number of actual video and photograph files recovered, and

20    many of those correspond to the victims in the substantive

21    counts charged in this case.

22              THE COURT:  Right.

23              MS. HARRELL:  There were also many instances where

24    we've called them empty files, where you could tell that a

25    video or picture had been received or distributed, but the

1   content of that file was no longer present and visible to

2   the agents on Mr. Wolf's phone because, presumably, one

3   party had deleted it.  So, because of that, we can --

4           THE COURT:  Any party can delete?

5           MS. HARRELL:  Yes.   Am I -- can any -- yes.

6           THE COURT:  Any -- okay.  So, is Telegram a one-

7   to-one communication source, or is it more like you put it

8   out on the web?  I don't (indiscernible).

9           MS. HARRELL:  It's a social media messaging

10  application where you can communicate one-on-one or you can

11  communicate in, like, chat groups with other people.

12          THE COURT:  Okay.

13          MS. HARRELL:  So, it's contained within the

14  application.

15          THE COURT:  Sort of like text messaging, you have

16  a group text?

17          MS. HARRELL:  Yes, Your Honor.

18          THE COURT:  Okay.  So, any person in that group

19  chat can delete the chat, the whole -- for everybody?

20          MS. HARRELL:  Yes.

21          THE COURT:  Off everybody's device?

22          MS. HARRELL:  Yes.  Yes.

23          THE COURT:  Okay.  So how is your conspiracy claim

24  -- well, what -- Mr. Wolf can -- admits guilt to Count 1?

25          MS. HARRELL:  Correct.

```
 1              THE COURT:  But I want to understand, is the --
 2   what's the basis to think there's a conspiracy beyond the --
 3   and there's a conspiracy, I get, but beyond the people who
 4   are identified in the -- the young men who in identified in
 5   the indictment?
 6              I mean, what makes you think it's beyond -- you
 7   just said earlier, it goes beyond those people.
 8              MS. HARRELL:  Well --
 9              THE COURT:  What makes you think that?
10              MS. HARRELL:  I'm not sure that the other
11   offenders that Mr. Wolf was communicating with were
12   specifically involved in this conspiracy, which was to
13   catfish Mr. Wolf's students.  That's how this indictment
14   charges it, right?
15              THE COURT:  I'm not talking about co-conspirators.
16   I'm talking about the overt act.  How do we know or what's -
17   -
18              Do you believe or your agents believe that there
19   were other young men, boys, targeted that aren't -- that
20   were deleted?  And if so, why do you believe that?
21              MS. HARRELL:  Oh, Your Honor, absolutely.  Strange
22   --
23              THE COURT:  Okay.  Why?
24              MS. HARRELL:  Mr. Strange and Mr. Wolf targeted
25   over the course of 5,000 -- near 5,000 pages of
```

1    communications between them.  It's very clear that they

2    targeted other boys --

3              THE COURT:  Okay.

4              MS. HARRELL:  -- in addition to these victims

5    charged in this indictment.

6              THE COURT:  You're right.  I used the wrong verb.

7    Target is the wrong verb.  I saw their text messages.  I

8    mean, did they actually obtain child pornography?  Did they

9    retain child pornography?

10             MS. HARRELL:  Yes.  Yes, Your Honor.  And some of

11   them -- and this actually was introduced at the change of

12   plea hearing.

13             Some images of those children have also been

14   recovered, including children who were targeted because they

15   had large online social media followings and were very

16   talented athletes, children who were participating in the

17   Little League World Series --

18             THE COURT:  Right.

19             MS. HARRELL:  -- in the late summer of 2021.  And

20   those children, some of them have been identified, have

21   identified themselves in sexually explicit images recovered

22   from Mr. Wolf's device.

23             But based on the facts of this case and the fact

24   that that would potentially be included as relevant conduct,

25   certainly information this Court --

1          THE COURT:  Okay.

2          MS. HARRELL:  -- can take into account in

3  sentencing, the indictment was not superseded to add

4  additional substantive charges related to those children.

5          There are others as well still -- I mean, the FBI

6  has worked to identify other children, send out leads, and

7  so on.  There are --

8          I mean, of the image files recovered that we can

9  actually see content from in the communications between Wolf

10  and Strange, I think there is an estimate that about 250 of

11  those image files depict children engaged in sexually

12  explicit conduct.  And not all of those children have been

13  identified.

14          THE COURT:  Well, how many, in your estimation, do

15  any of those children, other than the people identified,

16  subject to the catfishing scheme?

17          MS. HARRELL:  Yes.  All of them, as I understand.

18          THE COURT:  Oh.  So let me be clear then.

19          MS. HARRELL:  Yes.

20          THE COURT:  You believe that approximately 200 or

21  so, 250 young boys --

22          MS. HARRELL:  Yes.

23          THE COURT:  -- were all subject to the

24  Strange/Wolf, you know, Ash Hamilton and -- what's her name?

25  The other woman's name, strange names?

```
 1                MS. HARRELL:  Leslie.

 2                THE COURT:  Leslie.  Well, no, Leslie Hanson.

 3   There was another one too.

 4                MS. HARRELL:  And Alex Zampino (phonetic).  Alex

 5                THE COURT:  Alex Zampino.

 6                MS. HARRELL:  Yes.

 7                THE COURT:  You believe they were subject -- there

 8   were other people out of these eight?  That's what I was

 9   trying to get at.

10                MS. HARRELL:  Yes.

11                THE COURT:  There were other victims other than

12   these eight?

13                MS. HARRELL:  Yes.  And some -- I don't want to

14   say maybe 200 victims of the specific catfishing scheme.

15   Some of those victims were catfished by Mr. Strange on his

16   own and then distributed to Mr. Wolf and discussed, but yes,

17   in summary, yes.

18                THE COURT:  But some of them were still directed,

19   you believe, by Mr. Wolf?

20                MS. HARRELL:  Yes.

21                THE COURT:  Other than the eight?

22                MS. HARRELL:  Yes.

23                THE COURT:  Other than the people we know about in

24   this case?

25                MS. HARRELL:  Yes.  I would -- yes, I believe that
```

```
 1   Mr. Wolf participated with Mr. Strange, similar to how he

 2   did here in terms of providing instructions about what he

 3   wanted to see --

 4              THE COURT:  Okay.

 5              MS. HARRELL:  -- making requests of Mr. Strange

 6   and so on.

 7              THE COURT:  Okay.  So, Telegram is not like any

 8   other system I know then, because I don't know these, but

 9   typically, we send somebody in and they can go in through

10   some server and get something.

11              MS. HARRELL:  No.

12              THE COURT:  In this context, completely double

13   deleted, gone.

14              MS. HARRELL:  Correct.  And Telegram prides itself

15   actually on its lack of cooperation with law enforcement and

16   its great efforts to circumvent any kind of legal process.

17   And in fact, stores its servers of its own content in

18   various overseas locations --

19              THE COURT:  Okay.

20              MS. HARRELL:  -- for that exact reason, to avoid

21   the Government being able to obtain anything through a legal

22   process.

23              THE COURT:  Were there any photos shared -- I saw

24   that Mr. Wolf and Mr. Strange used pseudonyms on -- well, or

25   referenced pseudonyms on TikTok and Snapchat.
```

```
 1              MS. HARRELL:  Uh-huh.

 2              THE COURT:  And maybe others.  I don't -- I'm not

 3    aware of their names.  But were there any photographs

 4    recovered off those servers?

 5              MS. HARRELL:  No.  No, not -- no, Your Honor.

 6              THE COURT:  They were mostly communicative

 7    sources?  They were mostly --

 8              MS. HARRELL:  Yes.  And those were -- as Your

 9    Honor probably remembers from the sentencing memo, those

10    were also platforms where Mr. Strange was operating -- Mr.

11    Strange and Mr. Wolf were operating their teenage girl

12    personas.

13              THE COURT:  Yes.

14              MS. HARRELL:  So -- yes.

15              THE COURT:  Okay.  There's no -- the pictures of

16    the girls in your view were pictures -- they weren't Amy Act

17    pictures.

18              They're pictures -- nobody was solicited for the

19    girls' pictures.  They were pictures, unfortunately, already

20    out there to be taken, right?

21              MS. HARRELL:  Right.  Yes, Your Honor.

22              THE COURT:  No girl was solicited?

23              MS. HARRELL:  Correct.  Yes.

24              THE COURT:  Anything further?

25              MS. HARRELL:  No.  Thank you, Your Honor.
```

1          THE COURT:  Okay.  Mr. Donato, you were nice

2    enough to tell me how you're going to present, and I'm going

3    to let you do that.

4          I have a question.  Do you -- there's a -- the

5    United States has asked for a preliminary order of

6    forfeiture.  I believe it was part of the plea.  Any

7    opposition to that, sir?

8          MR. DONATO:  No, sir.

9          THE COURT:  All right.  So, we'll enter a judgment

10   of preliminary order of forfeiture.  Mr. Wolf, you

11   understand you're still under oath?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  Okay.  Do you understand that you're

14   giving up any right to a variety of items, computers, visual

15   depictions, videos, all identified in the United States

16   motion?  Do you know you're giving up any right to those

17   items?

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  Okay.  I will enter an order granting

20   the United States motion for preliminary order of

21   forfeiture.  So we begin that process, whatever we do with

22   that.

23         Okay.  Mr. Donato, I look forward to hearing from

24   you and Ms. Mattes and Mr. Wolf.  (Indiscernible).

25         MR. DONATO:  Ms. Mattes, with the Court's

1   permission, will go first.

2           THE COURT:  Please.

3           MS. MATTES:  Good afternoon, Your Honor.

4           THE COURT:  Good afternoon.

5           MS. MATTES:  I'd like to start, first of all, by

6   correcting error in our memo that says -- has the wrong date

7   for the change of plea, which --

8           THE COURT:  That's all right.

9           MS. MATTES:  -- is already placed on the record as

10  June 23rd, 2022.

11          THE COURT:  Right.

12          MS. MATTES:  And rather than interrupt the flow of

13  my presentation, there's just a couple points that I would

14  like to make initially.

15          You know, character is an interesting thing.  We

16  are certainly more than the things that we do, but what we

17  do does reflect on who we are and what we do and what

18  happens to us becomes a part of who we are.

19          And the events that bring everybody into this room

20  here today on both sides, I think reveal what complex and

21  fragile creatures human beings are.

22          THE COURT:  Who's the -- I'm sorry to interrupt

23  you.  Who's the both sides?  You don't mean the agents?

24          MS. MATTES:  I know.  I mean --

25          THE COURT:  Not both sides of the courtroom.  You

1    mean the children and Mr. Wolf.

2             MS. MATTES:  Right.

3             THE COURT:  Okay.

4             MS. MATTES:  I mean the Governments and its --

5             THE COURT:  Okay.

6             MS. MATTES:  -- people and the defense.

7             THE COURT:  Okay.

8             MS. MATTES:  And Mr. Wolf.  Andrew Wolf has

9    admittedly done terrible things, and he's acknowledged those

10   things, but his character is also reflected in other ways.

11            He did have friends, he maintained friends, and

12   some of those people have written to the court.  And I want

13   that to be clear.

14            However, people from the school were reluctant, if

15   not forbidden, to show their support.  There is the

16   possibility of litigation that remains out there.  Some

17   people believe that they were not able to write or allowed

18   to write --

19            THE COURT:  Whoa, whoa, whoa.  Slow down.

20            MS. MATTES:  -- on his behalf.

21            THE COURT:  Wait a second.  That's a big

22   statement.  I just sentenced the guy for doing that.  So

23   make sure you be careful what you said.  Do you believe that

24   people have been interfered with?

25            MS. MATTES:  Oh, no.  I'm not suggesting that

 1   people have been threatened in any way.  What I'm trying to

 2   suggest to the Court that when someone is --

 3           If someone is arrested for and convicted of

 4   soliciting and producing child pornography, there is a

 5   reluctance to come forward to the court and to write a

 6   letter on that person's behalf.

 7           THE COURT:  All right.  Okay.  Yeah.

 8           MS. MATTES:  And that there certainly is the

 9   concern on everyone's part that there's going to be

10   litigation against the school, that there is concern that

11   there's going to be litigation against Mr. Wolf.

12           And that there's going to be reluctance on their

13   part to come forward on his behalf and to write a letter

14   about --

15           THE COURT:  Okay.

16           MS. MATTES:  -- their personal relationship with

17   him that they had before these events took place --

18           THE COURT:  Got it.

19           MS. MATTES:   -- and that they stand by him in the

20   darkest hour of his life.

21           THE COURT:  That's a very good point.  But you

22   used the verb forbidden.

23           MS. MATTES:  Okay.  No, I'm not saying that.

24           THE COURT:  Okay.

25           MS. MATTES:  Sorry.  And some of those people, I

1    think, would be here, but those who are willing to and able

2    to are present.

3              THE COURT:  Well, I did receive -- I want you to

4    know, I did -- just like I read the letters from --

5              MS. MATTES:  Sure.

6              THE COURT:  I have, and very hopefully categories

7    friend, cousin, family.  So, I have read all those letters

8    as well.

9              MS. MATTES:  We tried.

10             THE COURT:  No, no.  I've got quite a few of them.

11   They were attached as Exhibit D to your memorandum.

12             And frankly, contrary to -- well, not contrary,

13   but different than what the United States says, there was at

14   least one person here that was involved at the SCH

15   community, who's no longer there, I believe --

16             MS. MATTES:  Yes.

17             THE COURT:  -- that's retired, that has spoken.

18   So, that -- when I read that, I was like, yeah, it's

19   probably people don't want to come forward.

20             So, your point, I understand it.  I was also -- I

21   don't like the word forbidden because that would go to a

22   problem with SCH that our friends might be concerned about.

23             MS. MATTES:  Well --

24             THE COURT:  No, I mean, if that's true, I'll have

25   a problem with that.

1           MS. MATTES:  Well, I don't know what's going on --

2           THE COURT:  Okay.  Fine.

3           MS. MATTES:  -- in terms of what people are being

4   told specifically, but there are people who could not come

5   forward or would not come forward for any number of

6   different reasons.

7           THE COURT:  Okay.

8           MS. MATTES:  This is not a proud moment for Andrew

9   Wolf, needless to say, and it's one with which he will have

10  many of these not proud moments for the rest of his life.

11          But the Court should know there are those who did

12  take the time to write something on his behalf, not just --

13  although they do have a risk of embarrassment by publicly

14  sending a letter of support to this court.

15          Andrew has done good work.  He has done community

16  service.  He has worked at food banks.  He has worked at

17  YMCAs.  He has done things that were above and beyond what

18  was required at the moment.  I'm going to talk about that a

19  little bit later.

20          I think the Court should also take note initially

21  this issue of the potential of a child actually being

22  touched.  And I know that this is not the Court's first

23  sentencing of this kind and I'm sure you've had the

24  misfortune of reading any number of these kinds of chats

25  over your career, as have the rest of us.

```
 1              And there's this certain element of trash talk
 2   that these people engage in.  For whatever reason, I tend to
 3   think it's because it excites the person who's talking and
 4   it is an attempt to excite and keep the person on the other
 5   side involved in the conversation, because there's no one
 6   else they're going to be able to talk to about this.
 7              They're actually online anonymously with someone
 8   who shares their same proclivities and they can talk about
 9   their fantasies.  And as real as you can make it, the better
10   it is for everybody involved.
11              And I'm going to suggest to the Court that that's
12   what happened in this case with regard to touching a 10-
13   year-old in the ways that has been described to the Court
14   earlier today.
15              THE COURT:  Wait.  Whoa, whoa, whoa.  Hold on.
16   Are you suggesting that it did not happen, that the grazing
17   of the penis when he --
18              MS. MATTES:  Yes.
19              THE COURT:  Okay.
20              MS. MATTES:  That child has been -- evidently has
21   been interviewed and has not disclosed that there -- that he
22   has been assaulted.
23              THE COURT:  Okay.
24              MS. MATTES:  There's been, I guess, roughly three
25   years for that to be --
```

```
 1              THE COURT:  Okay.

 2              MS. MATTES:  -- brought out.

 3              THE COURT:  Okay.

 4              MS. MATTES:  And so, what I'd like to do then is

 5    direct the Court's attention back to some other issues,

 6    those specifically having to do with the sentencing

 7    memorandum and the sentencing guideline that applies here.

 8              And we did spend a lot of time on the sentencing

 9    guideline.  I think that's time that the Court certainly --

10              THE COURT:  It was very helpful.  I had not seen

11    much of that research, so I appreciate you sending.  I

12    shared it around my colleagues.  Some of that I had not seen

13    before.  So, it was helpful.

14              MS. MATTES:  Thank you.  And of course, we're not

15    the first people to raise this issue of the sentencing

16    guideline 2G2.1 as being a guideline that the Court may

17    choose to reject as a policy matter because of the way that

18    it was promulgated.

19              It does not reflect, as the Court has referred to

20    earlier today, the experience and the expertise of the

21    United States Sentencing Commission in developing sentencing

22    guidelines based on its own set of rules, its own statute in

23    28 991 and 994.

24              And therefore, the guideline, as it has been

25    promulgated, developed, and amended, does not yield a
```

1    sentencing range that is a rough approximation of the

2    3553(a)(2) objectives.

3           And there are certainly reasons, especially the

4    Protect Act, which everyone cites, that the Court may find

5    that it does not agree with the guideline and reject it on a

6    policy basis.

7           However, the Court doesn't have to do that.  It is

8    not required to do it and it is not required to say why it

9    is or is not -- why it would not be doing it.

10           But the Court may also consider the sentencing

11    guideline and its provenance for giving it even less weight

12    as an advisory sentencing guideline in the way that it

13    fashions its sentencing today.

14           And that's the second reason for the Court to

15    consider the guideline and its background.  And

16    specifically, the Feeney Amendment under the Protect Act is

17    the basis upon which this challenge is raised.

18           And the Government cites the protect Act and the

19    Feeney Amendment as -- interestingly, as a reason for the

20    sentencing guideline to be the way it is.

21           The problem with the Feeney Amendment, one of

22    several problems, is that the Feeney Amendment was the first

23    situation where the Senate rewrote the sentencing guideline,

24    actually raised the base offense score and the statutory

25    maximum based on faulty information, the first being that

```
 1    sentences were too lenient at the time.
 2              But they -- they did -- they were ignoring the
 3    sentencing -- they were basing it on sentencing departures,
 4    there being too many of them.
 5              But they were ignoring that those departures, the
 6    rate of departures was largely based on or distorted by
 7    fast-track departures that were being granted in immigration
 8    cases where those fast-track programs were available.
 9              THE COURT:  Right.
10              MS. MATTES:  If you took out the fast-track part
11    of it, sentencing departures went down to 10 percent.
12              And the second problem, one of them, was that the
13    Butner study was being tossed around.  And I'm sure the
14    Court's heard about this before.
15              THE COURT:  Yeah.
16              MS. MATTES:  I know I'm not the first one to
17    mention that to you.  And that's been largely discredited,
18    if not completely discredited, since that time.  There was
19    very little discussion about it.
20              There was an opportunity for the Sentencing
21    Commission to weigh in and to suggest that this was not a
22    good idea, and for the judicial conference to weigh in and
23    say that it was also not going to work out, that it was
24    going to be a problem.
25              And also, Ted Kennedy, who was one of the authors
```

1   of the Sentencing Reform Act of 1984, also gave an extended

2   speech during the debate on this.

3              And as it was, finally, the decision was made to

4   have the Feeney Amendment apply only to sex offenses, and

5   that's what got the Feeney Amendment through.

6              And it resulted in Amendment 664 to the sentencing

7   guidelines, which produced a lot of what you see in 2G2.1

8   today.

9              However, what the Court should take away from

10  this, I hope this afternoon, is that even given all of that,

11  the sense of the Congress at the time was that in Section

12  602, that the Department of Justice should focus its efforts

13  and its resources on major producers, distributors, and

14  sellers of obscene material and child pornography.

15             That is commercial production of child porn

16  pornography.  That was the goal here.

17             And in the intervening decades since then, of

18  course, that has not been necessarily the focus of the

19  Department of Justice, the -- all of these -- or many of

20  these prosecutions are certainly not commercial production.

21             THE COURT:  Right.

22             MS. MATTES:  We now -- the people who are

23  prosecuted under the sentencing guidelines are individuals

24  who are not selling the child pornography.  They are

25  certainly maybe doing it in volume, but it's not a

1    commercial aspect.

2           THE COURT:  I think if you read the commentary,

3    I'd ask -- it's sort of off the topic, but the reality of

4    what happened though is --

5           I think what commentators have told me, I have no

6    personal knowledge, is that the large producers, the

7    commercial producers moved offshore.

8           MS. MATTES:  Yes.

9           THE COURT:  The effect of that law was that we can

10   no longer get -- the Department of Justice, not we.  The

11   Department of Justice can no longer get those folks.  The

12   large commercial producers, they're not sitting in

13   Philadelphia and, you know -- yeah.

14          MS. MATTES:  It's interesting though, the Bureau

15   of Justice Statistics still refers to this as commercial --

16          THE COURT:  Yeah.

17          MS. MATTES:  -- exploitation production.

18          THE COURT:  Yeah.  So does the guideline.

19          MS. MATTES:  Yes.  Exactly.  So, the result is the

20   guideline that we have, and it has several flaws that I have

21   outlined in my memorandum.  I don't want to spend too much

22   time on it, but I do want the Court to consider this.

23          That the principal flaw of this guideline, of

24   course, is that it fails to differentiate between offenders

25   because everybody practically ends up very near or at a life

1    sentence --

2              THE COURT:  Right.

3              MS. MATTES:  -- guideline.  The enhancements --

4    and this is -- because of the Protect Act, everybody gets an

5    enhancement for the victim's age, either two or four levels.

6              The care and custody aspect, that applies to 60

7    percent of offenders.  A misrepresentation of identity or

8    use of computer applies to 45 percent.

9              And interestingly, because it applies directly to

10   this case, more than -- almost 62 percent of use of computer

11   cases involve teenagers.

12             What's happened in the internet age is that this

13   is how typically child pornography cases now are worked.

14   And of course, if there's more than one victim, you have the

15   other enhancements that are now applied.

16             I would point out to the Court the 2021 Sentencing

17   Commission report that I believe has some of the best data

18   and most available data for the Court to consider.

19             And this case is different from the typical case

20   in some regards.  The people who got the longest sentence --

21   and I don't want to be misunderstood here.

22             There is nothing that either Mr. Donato or I will

23   say here that will anyway denigrate the heartbreak and the

24   sense of betrayal that these young men and their families

25   have felt and are feeling.

```
 1              But if this is going to be a rational process,
 2    there has to be some parsing of the facts and a way to
 3    understand this case for what it is and in comparison to
 4    other cases.
 5              And having said that, the people who get the
 6    longest sentences are those who victimize babies and
 7    toddlers, those who are parents.
 8              And we know those people exist, who victimize
 9    their children.  Those who engage in or facilitate the
10    sexual assault of the victims, or those who incapacitate the
11    victims.
12              That's where these longest sentences are meted at
13    by the federal courts nationwide, at least in 2019.  So, of
14    course, none of those factors apply to Andrew Wolf.
15              People who receive lower sentences are those who -
16    -
17              THE COURT:  If you direct somebody through a
18    pseudonym to touch somebody else, both who are children, is
19    that not directing the pornography?
20              MS. MATTES:  What the sentencing -- well, of
21    course, it doesn't help every situation.
22              THE COURT:  Right.
23              MS. MATTES:  What the sentencing guideline -- the
24    guideline the commission is talking about there is where one
25    adult facilitates a sexual assault.
```

1          THE COURT:  Nothing in the -- I don't --

2    respectfully, I don't see any -- I don't see the word adult

3    in there.

4          MS. MATTES:  Well --

5          THE COURT:  I mean, it doesn't -- I don't see the

6    idea.  It's one adult facilitating in this sense.  One adult

7    playing the role of Ashley Hamilton, playing a role of a

8    young girl.

9          You would -- I think you might agree with me.  I

10   think I understand your argument.  See if you and I are on

11   the same page.

12         MS. MATTES:  Yeah.

13         THE COURT:  If this actually were Ashley Hamilton,

14   if this were a 14-year-old girl, right, and she -- or better

15   yet, a 19-year-old girl, the adult idea, and she was

16   directing it, we'd have the same problem.  Would we not?

17         MS. MATTES:  Well, we're talking about one adult -

18   - we're talking about one person --

19         THE COURT:  One adult.

20         MS. MATTES:  -- facilitating or like getting

21   another -- a person for a meetup or traveling.

22         THE COURT:  No, I'm talking about this.  I've had

23   the case, the babysitter telling the one boy to touch the

24   other boy.

25         MS. MATTES:  Uh-huh.  Uh-huh.

```
1              THE COURT:  Is that -- okay.

2              MS. MATTES:  I think that that's true.  I think

3     that that applies.

4              THE COURT:  Yeah.  Okay.  So that applies.  So,

5     how do you distinguish that?  We have an adult male

6     directing through a pseudonym, either Strange or himself,

7     directing through a pseudonym, somebody's conduct as the two

8     other people?

9              MS. MATTES:  Well, he's directing conduct of which

10    -- which one of the minors is in court?

11             THE COURT:  Well, I -- my understanding -- well,

12    let me say this.  I don't know if it's -- the relevant

13    conduct, is there's an allegation that he directed one boy

14    to go touch his brother.

15             MS. MATTES:  Yes.  Well, that's in one part -- one

16    aspect of one case.

17             THE COURT:  I got it.

18             MS. MATTES:  That is not the (indiscernible) --

19             THE COURT:  It's not everybody.

20             MS. MATTES:  -- aspect of the case.  And there's a

21    lot of conduct here.  I'm not suggesting that that's not

22    true.

23             THE COURT:  Okay.

24             MS. MATTES:  But I do think that that is not

25    necessarily the broad --
```

1              THE COURT:  No.

2              MS. MATTES:  -- factual scenario that the

3    Sentencing Commission was referring to in the report.

4              THE COURT:  Okay.  I understand your argument.

5    Okay.

6              MS. MATTES:  I think that's a very specific

7    factual aspect of this case.

8              THE COURT:  It would be a different case if

9    everybody was directed that way, clearly.  I get your point.

10             MS. MATTES:  Absolutely.

11             THE COURT:  On a spectrum of culpability, that

12   would be a much worse situation.

13             MS. MATTES:  Absolutely.  And I think that's what

14   the Sentencing Commission is talking about.  We're talking

15   about nationwide statistics here.  I'm not talking about

16   individual aspects.

17             THE COURT:  Okay.

18             MS. MATTES:  But I think the Court does have to

19   consider how -- because the Government is asking you to do

20   this too, and the Court sort of has to, because there's a

21   question of sentencing disparity.

22             And no two cases are going to be exactly alike and

23   I certainly would make that point with regard to the case

24   the Government has suggested that the Court consider in its

25   own sentencing memorandum.

```
 1            These cases are not all the same.  None of them
 2   are the same, but in every regard.
 3            And, of course, people have -- when the victims
 4   are older, sentences tend to be lesser.  And those certainly
 5   apply to this set of circumstances.
 6            We don't have infants, we don't have toddlers.
 7   They're not -- they're still vulnerable in terms of being
 8   impressionable, being young, just barely post-pubescent, but
 9   they are not as young as the Court -- or some predators have
10   been victimized.
11            THE COURT:  Well, the idea there is that those
12   victims have no idea.  Right.  They're -- the baby ones are
13   the -- you know, that's on the one side of the spectrum, the
14   baby ones.
15            MS. MATTES:  Sure.
16            THE COURT:  And frankly, the three-year-old ones.
17   Your point is that we're not dealing with -- we're dealing
18   with somebody -- the victims in your view --
19            And not suggesting you're making any disparagement
20   with the victims, but the boys here are not babies and
21   they're not toddlers.
22            MS. MATTES:  Right.  Of course.  And having said
23   that, I do want to address this issue of the zero prior
24   records score, because that is not something that's
25   addressed in the sentencing guidelines.
```

```
 1                    THE COURT:  Sure.
 2                    MS. MATTES:  And that is something that's worth
 3      the Court's consideration.
 4                    THE COURT:  Isn't everybody I -- everybody I've
 5      seen in these -- I see very few of them that have more than
 6      one.
 7                    MS. MATTES:  Well, yeah, but there's a difference.
 8      There's a -- and the Sentencing Commission has studied this.
 9      Now, finally, after all these years of lumping everybody who
10      has a prior conviction with people who have zero conviction
11      --
12                    THE COURT:  Okay.
13                    MS. MATTES:  -- and zero arrests.
14                    THE COURT:  Okay.  Got it.  That's changing.
15      Right.  Got it.
16                    MS. MATTES:  Right.
17                    THE COURT:  Right.  That's one of the amendments.
18      Right.  Okay.
19                    MS. MATTES:  Exactly, Your Honor.  And it's
20      changing for a reason.  Because the people who have zero
21      arrests, zero convictions, have a much lower recidivism
22      rate.  Statistically, they have a lower chance of committing
23      a new crime.
24                    And that's based -- this is one of the beautiful
25      moments where the Sentencing Commission's research actually
```

1   comes together and it's very compelling and they're moving

2   to change it.

3           Of course, the amendment that I saw is excluding

4   sex offenses.

5           THE COURT:  Right.  Right.  And when you read the

6   -- well, I don't have an academic discussion racing here,

7   but --

8           MS. MATTES:  Sure.

9           THE COURT:   -- there's a good reason.  They

10  suggest a reason having to do with something of Mr. Wolf's

11  conduct.  And that is that very few people engaging in child

12  pornography get caught the first time, so --

13          I mean, I don't want to go into it, but that's --

14  I don't suggest a right or wrong, but that's part of the

15  reason.

16          MS. MATTES:  Yes.  Yes.  And with that then, Your

17  Honor, I just would like to talk to the Court a little bit

18  about variances --

19          THE COURT:  Okay.

20          MS. MATTES:   -- under 3553, specifically with

21  regard to the nature of Mr. Wolf's possibility of being

22  victimized in prison.

23          And I know that the Court read this, but I think

24  it's worth the Court taking some time and my taking some

25  time with you, if you don't mind.  This continues to be a

 1  problem despite the Prison Rape Elimination Act.

 2              THE COURT:  Right.

 3              MS. MATTES:  There have -- this continues to be an

 4  issue in prison.  And Mr. Wolf is a small person.  He --

 5              I know the Bureau of Prisons does try to group

 6  people in order to avoid it, but you cannot -- evidently,

 7  they have been unable to prevent people from being

 8  victimized.

 9              There's a senate report with regard to women being

10  victimized and I cite to that in my memorandum.

11              THE COURT:  Yeah.

12              MS. MATTES:  Men are ever more reluctant to report

13  their own victimization.  We don't know how many people

14  aren't, but between 2016 and 2018, there were 5,000 reported

15  substantiated sexual harassment and assault in the federal

16  prisons, as I noted for the Court.

17              And so, we -- and the fear of being sexually

18  assaulted is something that is worthy of this Court's

19  consideration in terms of setting sentence for a possible

20  downward variance.

21              As to the nature and circumstances of the offense,

22  I would merely point out for the Court that the -- in this

23  particular case, that there was never a danger to these

24  victims, that they would have bodily injury inflicted upon

25  them.

```
 1              That while this is psychologically egregious for
 2   them, and I recognize that, and the Court does too.
 3              THE COURT:  You wouldn't dare -- I don't think
 4   you're suggesting to me that -- oh, you would characterize
 5   that line about wanting to rape as being trash talk.
 6              MS. MATTES:  Of course.
 7              THE COURT:  Okay.  Okay.  Okay.
 8              MS. MATTES:  Of course.  Yes, sir.  Yes, sir.
 9   Yeah.  I'm not -- and I'm not here this afternoon to defend
10   the talk.
11              THE COURT:  No, no.  And we're not here today.
12   You don't go to jail for talk.
13              MS. MATTES:  Precisely.  The talk is not the
14   problem and I know --
15              THE COURT:  Well, you could go to jail for talk,
16   but not today.  Not in this one.
17              MS. MATTES:  Not in this context.  No.
18              THE COURT:  Right.
19              MS. MATTES:  The --and I don't want to get lost in
20   the weeds here with regard to some of these other cases, but
21   --because they don't factually match up.
22              THE COURT:  You mean the comparatives in our
23   district?
24              MS. MATTES:  Well, no, some of these other --
25   yeah, some of these other cases, you can't match them up.
```

```
 1              I understand the Government has its position with

 2    regard to how long the sentences are and that this sentence

 3    should be as long as that sentence, but the people are in

 4    different --

 5              THE COURT:  Yeah.

 6              MS. MATTES:  -- circumstances.  One person had a

 7    traumatic brain injury.  One person is a contact offense.

 8    One person was an 11(c)(1)(C) plea.

 9              THE COURT:  Yeah.

10              MS. MATTES:  I mean, they did -- I don't know how

11    --

12              THE COURT:  Let talk about the case.

13              MS. MATTES:  Okay.

14              THE COURT:  More or less culpable than Strange?

15              MS. MATTES:  Precisely.

16              THE COURT:  No, no.  No, no.  That's a question.

17    I'm sorry.  More or less culpable than Strange?

18              MS. MATTES:  Well, I think when some of them are

19    actually more --

20              THE COURT:  No, no.  No, no.  Is Mr. Wolf more or

21    less culpable than Kray Strange?

22              MS. MATTES:  Oh.  Your Honor, I'm sorry.  I didn't

23    understand.

24              THE COURT:  No, I was -- I wasn't clear.

25              MS. MATTES:  I don't know all the details of Mr.
```

 1    Strange's set of circumstances.

 2           THE COURT:  Okay.

 3           MS. MATTES:  I do know that he was younger.  I do

 4    know that there's some discussion that he's on the autism

 5    spectrum.  There are certainly mitigators.

 6           THE COURT:  Well, I'm not talking about that.  I'm

 7    talking culpability.  Put aside mitigation.  I mean, are

 8    they equal in your mind?

 9           I mean, you realize that on March 31st or

10    something, I'm going to see the US attorney again.  I'm not

11    going to see you and I'm going to see Kray Strange.  Right?

12           And whatever I do today has some play, I'm sure

13    from talented counsel for Mr. Strange to say, well, or maybe

14    not, look at what you did with Mr. Wolf.

15           So, I want to get your instinct.  Where are we on

16    the culpability scale of Mr. Wolf and Mr. Strange?

17           MS. MATTES:  I'm going to -- can I ask Mr. Donato

18    to answer that?

19           THE COURT:  Well, Mr. Donato could address it.

20    Thank you.

21           MR. DONATO:  I'll answer it when I address the

22    Court.

23           THE COURT:  Thank you, sir.  Thank you.

24           MS. MATTES:  Yeah.  I'm going to let Mr. Donato

25    answer it.

```
 1              THE COURT:  Not a problem.  Not a problem.  It's a
 2   question you expect, but I have --
 3              MS. MATTES:  Yeah, we do expect it.  I'd like him
 4   to answer it.
 5              THE COURT:  Okay.  It's a disparity question I
 6   face most directly.
 7              MS. MATTES:  I'm sure.  I'm sure.
 8              THE COURT:  Okay.
 9              MS. MATTES:  And I'd like to address the Court
10   most directly with regard to the history and characteristics
11   of Mr. Wolf because we are seeking a downward variance based
12   on his history and characteristics.
13              THE COURT:  Right.
14              MS. MATTES:  And I know the Court has my
15   memorandum.
16              THE COURT:  And all his awards and letters.
17   They're all very helpful.  Thank you.
18              MS. MATTES:  Actually, you don't have all his
19   awards and letters.  We cut them down.
20              THE COURT:  Oh, oh, I see.
21              MS. MATTES:  I didn't want to give you everything.
22              THE COURT:  Okay.
23              MS. MATTES:  I didn't want to give you, you know,
24   the pictures of him as a drum major for Cornell University
25   or --
```

1                THE COURT:  Okay.  Okay.

2                MS. MATTES:  -- all of that.  But I did want to

3    give you a flavor of his life as a young man and as a child,

4    because he always met everybody's expectations and then

5    exceeded them.

6                As his parents were happy to tell us, and we're

7    happy to tell you, he was, as described by his family, and I

8    think our family can be said to know us and our character,

9    as intelligent, caring, dedicated, helpful, the family

10   historian, loving father to Charlotte for the period of time

11   he had that opportunity.

12               As a student, he was superlative.  He gained --

13   had awards, as the Court has, in his possession.  You know,

14   everything he did, he took to the highest point possible.

15               And that may say something about his compulsive

16   behavior that's referred to by Dr. Atkins.

17               He had scholarships, advanced mathematics, all

18   these things.  He was the valedictorian.  He was always

19   employed from the time he was in college.  He always had a

20   job.

21               And I would like to put to rest this idea that he

22   targeted the school because it gave him an opportunity to be

23   around children he found attractive.

24               The job opening became -- the job became open.

25   Someone else was going to take it and then didn't and he had

1    the -- he was offered the opportunity to interview.

2          He was already -- the job he had was coming to an

3    end and so he had the chance to interview and they hired

4    him.

5          But even there, although what he did with was

6    terrible and is inexcusable, as everybody acknowledges, Mr.

7    Wolf did serve members of that school and did receive

8    important accolades there.

9          He did stuff he didn't have to do, became -- put

10   himself in charge of scheduling, in addition to all the

11   other things that he was doing there.  And these things are

12   worthy of the Court's consideration for a downward variance.

13         I know that this behavior went on for a long

14   period of time, but it wasn't the only thing he did.  He

15   also did good things.  And it's a mixed bag for the Court.

16   He did serve others.  He did benefit others.

17         And that may be the central tragedy of Mr. Wolf's

18   life, is that he was more than just his offense, but his

19   offense is very serious and the Court can't ignore it.

20         He loses all that.  He loses his -- the good

21   regard of all the people who are here today, his reputation

22   in the community, his family.  There are members of his

23   family he may never see again living a free life.

24         All of that goes away as a result of this offense

25   and we're asking the Court to consider that.

1           The fact that he is indeed a first offender and

2    that first offenses and being incarcerated for the first

3    time is a different experience than it is for a more

4    experienced person, someone who is more versed in the

5    criminal law.

6           We're asking the Court to --

7           THE COURT:  Is it curious to you -- I'm not trying

8    to make it harder for you, but is it curious to you, or how

9    would you explain, and maybe Mr. Donato wants to, the idea

10   that when he was approached by the FBI with the Dropbox

11   information, that he either didn't fully disclose or

12   misrepresented the full extent of his involvement?

13          I mean, is that -- that's what happens, right?  I

14   mean, be realistic, Judge.  Right?  I get you.  But it is a

15   little bit different.  I mean, there's no claim in here for

16   misrepresentation to a federal agent.  There's no 1001.

17          MS. MATTES:  Right.

18          THE COURT:  So -- but how do I reconcile that?

19   It's not like a person that comes in front of me and just

20   completely falls on the sword and says, yeah, I did all

21   that, the first time I'm walking in.  And by the way, I'm

22   also taking -- I'm also trying to solicit people in my

23   school.  That wasn't said.

24          MS. MATTES:  Mr. Donato is telling me he wants to

25   talk to you about that.

```
 1              THE COURT:  Please.  That's a way to do it, Ms.
 2   Mattes.  Just hand it down.  That's the way to do it.
 3              MS. MATTES:  I know.  I like it, Your Honor.
 4              THE COURT:  That's good.  It's good to go first.
 5              MS. MATTES:  I like it a lot.  I wish we could do
 6   every case together.
 7              THE COURT:  Right.
 8              MS. MATTES:  And I also want to note to the Court
 9   the level of Mr. -- and he's going to talk to you about this
10   too, the level of Andrew Wolf's remorse.  And this is the
11   part where you see him fall on the sword --
12              THE COURT:  Okay.
13              MS. MATTES:  -- starting that part.
14              THE COURT:  Okay.
15              MS. MATTES:  He has expressed his remorse to his
16   parents and he told Dr. Somerton that -- and I think the
17   Court read this, that he disgusts himself.
18              And, you know, Dr. Somerton's report talks about
19   the lack of insight as a concern for recidivism based on his
20   clinical experience.  And that's an important qualifier and
21   that's why we have a second report from Dr. Atkins.
22              Clinical experience, as Dr. Atkins notes in his
23   December report, is not a valid predictor, if any exists,
24   for maybe having an opinion as to the future.
25              The literature actually shows that it is a very
```

1  poor way of predicting someone's behavior.  And Dr. Somerton

2  also qualifies it later in his report.

3           But in fact, it's unsubstantiated in the

4  literature that a lack of insight is -- to the big larger

5  point, that a lack of insight is a concern for recidivism.

6  That's not reported anywhere in the psychological

7  literature.

8           And so, we're encouraging the Court to ignore that

9  because there is nothing to support it other than an opinion

10 that is itself questionable.

11          There are other aspects of Dr. Somerton's report

12 that we believe are accurate because they dovetail Dr.

13 Atkins, that Mr. Wolf does indeed need help, Mr. Wolf does

14 have a problem.

15          And the fact that he is and always will be

16 attracted to pubescent young boys is, of course, a point of

17 concern only if he acts on it.  That's when it's a point of

18 concern.

19          And the reason that someone like Andrew Wolf gets

20 treatment is so that he will not act on it.  That's the

21 whole point of getting treatment.

22          And he's actually undertaken that post-offense and

23 pre-sentencing.  He's been in treatment as the letter

24 indicates.  I'm going to suggest to the Court the fact that

25 he has done that is a basis to vary downward.

1          THE COURT:  Okay.

2          MS. MATTES:  And I'm also going to suggest to the

3    Court that the Court can promote respect for the law and

4    provide just punishment with the 15-year mandatory.

5          Andrew Wolf will be 57 years old, thereabout, when

6    he is released, as I've indicated in my memorandum.  He can

7    be supervised for anywhere from five years to the rest of

8    his life.

9          There are other punishments that go along with

10   this that the Court, I think, has considered.  I don't know

11   if it's legally considered a punishment, but he's subject to

12   financial constraints.

13         THE COURT:  Right.  SORNA, etc.  Registration.

14         MS. MATTES:  Yeah.  SORNA.  And he will suffer the

15   opprobrium of the public for the rest of his life.  That is

16   never going to go away.

17         The kind of disdain that people feel for sexual

18   child offenders, I don't think it's paralleled in any other

19   crime, at least not in my experience.

20         The level of absolute hatred that people feel for

21   sex offenders of this nature is just unparalleled.  And he

22   still lived with that.

23         And whether he's in prison or outside of prison,

24   that's what he's going to be carrying.  He's not going to

25   have -- be able to find a place to live.  He's not going to

 1    have employment.

 2              And in the intervening 15 years he's going to be

 3    incarcerated.  It seems to me that that does cover a lot of

 4    respect for the law and just punishment.

 5              And, of course, affording deterrence and

 6    recidivism, 15 years is certainly enough to deter Mr. Wolf

 7    individually.  And it would seem to me that it would also be

 8    enough if anybody sees what he's losing here as a result of

 9    this should be enough to deter almost anybody who would

10    indeed be deterred.

11              And he'll be 57, which as the Court knows, as

12    people age, they become less and less likely to recidivate.

13    If you have to rely on something, that's something to rely

14    on too, but I don't -- I think you have better things to

15    rely other than that.

16              THE COURT:  Yeah.

17              MS. MATTES:  He does need treatment while he's

18    incarcerated.  There is this sexual offender management

19    program.  We're going to ask that he be designated where

20    that might be available in the wisdom of the Bureau of

21    Prisons.

22              And, of course, I know that we've talked about the

23    guideline range.  Justice Kennedy said in 2003 that the

24    guidelines are too high.

25              I think he was speaking specifically to this

```
 1    guideline and to guidelines like it, that -- and it should
 2    be --
 3              The Court should note that with regard to this
 4    guideline and 2G2.2, that from the time this guideline was
 5    changed, 2003, that there's a widening gap.  As the
 6    sentencing guideline has gone up, the number of variances
 7    has also gone up.
 8              THE COURT:  Yeah.
 9              MS. MATTES:  There's a widening gap.  Courts more
10    and more frequently are varying, not departing.  We're not
11    asking the Court to do that.  Varying downward.
12              In 2019, 36 percent of the 500 and some defendants
13    nationwide were sentenced strictly as production defendants.
14    36 percent of them received downward variances on non-
15    Government sponsored sentences or variances.
16              So, I can also talk to you about policy
17    statements, but I talk about that in my memo --
18              THE COURT:  Yeah, I've read that.
19              MS. MATTES:  -- and not going to trespass you too
20    much longer --
21              THE COURT:  It's well done.
22              MS. MATTES:  -- your time too much longer.  But
23    that does circle back to where we are with the guideline,
24    and that is that it is not a guideline the Court needs to be
25    too concerned about.
```

```
 1              We're recommending the mandatory minimum.  I know
 2   the Court has some more naughty questions and that's why I'm
 3   reserving some more time for Mr. Donato who's better for
 4   those questions.
 5              THE COURT:  Sure.
 6              MS. MATTES:  Thank you for the Court's time.
 7              THE COURT:  Thank you for your presentation.  Mr.
 8   Donato, I want to ask -- I don't want to lose track of two
 9   questions for the United States.
10              MR. DONATO:  I have them here, so --
11              THE COURT:  No, no, no.  I want to ask -- I want
12   to ask attorney for United States.
13              MR. DONATO:  Oh, I'm sorry.
14              MS. HARRELL:  Yes, Your Honor.
15              THE COURT:  I'll get right back.  Don't worry --
16   don't go too far, Mr. Donato.
17              MR. DONATO:  I won't.
18              THE COURT:  I heard something in the first
19   sentence there that really, really bothered me.  You heard
20   what the word was.
21              Does the United States have any indication -- does
22   any agent have any indication that anyone from that
23   community has forbidden or in any way harassed anybody from
24   testifying on behalf of Mr. Wolf?  That's a yes or no.
25              MS. HARRELL:  No, Your Honor.
```

```
 1              THE COURT:  Have you received any information from
 2   anyone that they felt like they could not come forward?
 3   Does anybody in the SCH community, donors, alumni, does
 4   anybody threaten anybody not to come forward?
 5              MS. HARRELL:  No.  And may I say something else,
 6   Your Honor related to that?
 7              THE COURT:  Is the answer no?  Okay.  Yes.  You
 8   may.  Sure.
 9              MS. HARRELL:  The answer is no.
10              THE COURT:  Yeah.  Okay.
11              MS. HARRELL:  In fact, the Government has heard
12   the opposite, which was conveyed by the mother of Minor 5,
13   that many of the victims in this community have felt extra
14   apprehension about coming to court because of the obviously
15   public nature of just being here and letting other people in
16   the community know that their child was a victim as well.
17              So that is the only concern we have heard about
18   people in the school not coming forward.
19              On top of that, because of that concern and the
20   concern that has been echoed by the families who are here
21   today, some people, teachers in the school and
22   administrators, chose not to attend today to maintain the
23   victims' privacy.
24              So as far as the Government knows, the concern at
25   the school is continuing to protect these kids as best they
```

```
 1   can.

 2            THE COURT:  Okay.  Second, what's your response to

 3   the idea that all this language is just, you know -- I don't

 4   like the expression used a few years ago by a candidate.

 5   They called it locker room talk or trash talk.  Right?  We

 6   all know what that is.  But it's not in of itself --

 7            MS. HARRELL:  No.

 8            THE COURT:  -- actionable.  But what's your view

 9   of it?

10            MS. HARRELL:  My view of it, Your Honor, is that

11   so much of it is obviously true.  We know that from the

12   Defendant's -- the crimes.  And I would submit to the Court,

13   as I discussed earlier --

14            I mean, these were the Defendant's closest

15   confidants.  I would submit that every single word written

16   in there is the Defendant's truth, what he wanted to do and

17   what he did do.

18            It's remarkably detailed.  It is -- the comments

19   about the 10-year-old in particular, they don't rise to the

20   level --

21            I mean, he was talking with one teacher who was

22   actually sexually assaulting his own student.  He didn't

23   say, oh, me too, to, you know, gain the admiration of that

24   man.  Instead, he talked about, in the Government's mind,

25   what he actually did.
```

```
 1              THE COURT:  Okay.  All right.  Thank you.  Mr.
 2    Donato, I appreciate your patience, sir.
 3              MR. DONATO:  Thank you, Your Honor.  Let me begin
 4    by addressing one of the questions you --
 5              THE COURT:  Please.
 6              MR. DONATO:  -- posed to us.  You asked whether we
 7    had a thought about whether Mr. Wolf was more or less
 8    culpable than Mr. Strange.
 9              And since the Court asked that directly, it's not
10    something that I would ordinarily address, but you've asked
11    me a direct question, and so I'll answer it.
12              I assume the Court means by the word culpable,
13    who's guiltier, generally speaking.
14              THE COURT:  Well, you and I deal in a world
15    sometimes with guidelines that have managers, supervisors --
16              MR. DONATO:  Right.
17              THE COURT:  -- you know, accomplices.
18              MR. DONATO:  So, I don't regard -- on the issue of
19    manager, supervisor, leader, I don't regard either one of
20    them as being more culpable than the other.
21              THE COURT:  Okay.
22              MR. DONATO:  As to the general conceptual idea of
23    guilt and keeping in mind that I know nothing about Mr.
24    Strange, but I do know the case against him, the thing that
25    makes this case more culpable than that case is that these
```

```
 1    were Andrew Wolf's students.
 2               THE COURT:  Right.
 3               MR. DONATO:  And they -- and so he had a duty to
 4    them that Mr. Strange did not have.
 5               THE COURT:  I appreciate your candor.
 6               MR. DONATO:  You also asked how to reconcile the
 7    fact that when he was arrested, he didn't come clean with
 8    the FBI, hedged a little bit with Dr. Somerton.
 9               And the best answer I can give you for that is
10    that I've spent a lot of time with him since I began
11    representing him in October or November of 2021, and he's
12    not a liar.  But he minimized it to me too.
13               And I think it's because the Andrew Wolf that I
14    know could not get himself to admit that he, the Andrew Wolf
15    that he wishes to be, could have engaged in this behavior.
16               And it took him a while and it took us a while to
17    talk to him and to confront him with things before he could
18    accept.
19               It's not that he didn't know, but he could not
20    accept what he had done.  I think by the time of the change
21    of plea in June of 2022, he was there or almost there.  I
22    know he's there now.
23               I want to also address the question that you asked
24    Ms. Mattes.  She was talking about adults who direct other
25    adults to sexually assault children.
```

```
 1              And I think the Court asked her, not in these
 2   words, well, isn't that what's going on here?
 3              THE COURT:  At least that's the one of them.
 4              MR. DONATO:  The one --
 5              THE COURT:  Touch your brother.
 6              MR. DONATO:  Touch your brother.  And here's what
 7   I -- here's the difference that I think it is, and it may be
 8   splitting hairs, but I don't think it is.
 9              THE COURT:  Okay.
10              MR. DONATO:  When an adult facilitates a sexual
11   assault on an unwilling victim, that's one thing.  When an
12   adult suggests that someone touch someone else, and the
13   person who's doing the touching is not unwilling, that's a
14   different thing.  It's not a sexual assault.  It didn't
15   occur --
16              THE COURT:  On the brother?
17              MR. DONATO:  To touch -- my understanding is he
18   touched his arm.
19              THE COURT:  Okay.
20              MR. DONATO:  And the little brother was asleep, so
21   he can't consent to anything.
22              THE COURT:  Right.
23              MR. DONATO:  Okay?
24              THE COURT:  But it's his consent we're looking
25   for.  It's not -- if there were more than touching the arm,
```

1    you would agree that's non-consensual.

2              MR. DONATO:  That would be a problem.  Yes.  But

3    we don't have that problem here.

4              THE COURT:  I got what you're saying.  Okay.

5              MR. DONATO:  I wanted to address something the

6    Government said about Dr. Atkins.  And this is an important

7    point, I think.  Dr. Atkins was candid in his report.

8              What he's saying in the report, Your Honor, is

9    that there are a group of people, there's people out there

10   who will always have a sexual preference for minors, and

11   Andrew Wolf is one of them.  And so, he's honest enough to

12   tell the Court that's who he is.

13             But the mere fact that he has that preference is

14   not a crime, as the Court knows.  And so, if he doesn't act

15   on that again ever in his life, then the preference is not

16   something to be held against him.

17             A few more thoughts.  As to the language in the

18   messages, the Government recounts the vulgar ugly language

19   in their memo in their Exhibit C.

20             I think it's fair to say that experience shows

21   that when you're speaking anonymously on some sort of a

22   device where you can't be held responsible for your conduct,

23   that allows for lies.

24             That mere speech is not a crime, even as

25   disgusting as it is to read.

 1                    THE COURT:  He's anonymous to Kray Strange?

 2                    MR. DONATO:  Well, it's not like he's in the same

 3       room, right?  It's --

 4                    THE COURT:  Well, that one is in the pandemic.

 5                    MR. DONATO:  No, but -- no, but Your Honor, if I

 6       may, if I'm corresponding with somebody who I know and it's

 7       just going to be text messages and I'm never going to see

 8       the guy, that makes it easier for me to say things that are

 9       either salacious or lies or exaggerations or whatever I want

10       to say.  And it's not necessarily a statement of intent.

11                    THE COURT:  Oh, I get that.  I'm not suggesting a

12       statement of intent, but I have no basis to think -- well,

13       there are statements in there about future conduct that are

14       not statements of intent under any definition of criminal

15       law.

16                    MR. DONATO:  Right.

17                    THE COURT:  Okay.  But they are indicators of what

18       could be -- see, when you say -- you have -- I agree with

19       you and Dr. Atkins about the idea that people have these --

20       people who --

21                    For whatever reason, you can love who you love.

22       So, people who you love and you -- and if you have an

23       attraction to somebody that's a certain age, and as

24       different as it is from what I may think of, that's their

25       view.

1            But the difference here I want to ask is, is the

2    idea that there's these messages saying, you know, how I

3    would love to rape that, or I can't wait to fuck that kid.

4    Those kind of things.

5            MR. DONATO:  Yeah.  It's -- as I said, Your Honor,

6    it's ugly.

7            THE COURT:  Could you just throw that away?

8            MR. DONATO:  It's ugly and vulgar.  Well, I don't

9    throw it away.  I throw it away for a reason.

10           THE COURT:  Okay.  I know.  Yeah.  Right.

11           MR. DONATO:  And the reason is because Andrew Wolf

12   has spent his adult life around children.

13           THE COURT:  Yeah.

14           MR. DONATO:  And there's no allegation that he

15   touched any of them.

16           THE COURT:  Okay.

17           MR. DONATO:  So, if he was going to do that, if he

18   was really interested in doing that, it would've happened by

19   now.  And if it happened even slightly, the Government

20   would've charged it.

21           THE COURT:  Okay.

22           MR. DONATO:  You said something interesting

23   earlier today that the naturalization service is one of the

24   best things a judge gets to do.

25           THE COURT:  Yeah.

```
1            MR. DONATO:  I think sentencing must be among the
2    most difficult things a judge is called upon to do.  But
3    what I want to say to you this afternoon is that sentencing
4    is either a rational exercise or a passionate one, but it
5    can't be both.
6            THE COURT:  It can't be the second.
7            MR. DONATO:  And the Court should not consider not
8    --
9            THE COURT:  It's not going to be the second.
10           MR. DONATO:  Yeah.  That's the point I was trying
11   to make.  Thank you, Your Honor.
12           The Court should not consider or should give very
13   little weight to the messages that were sent back and forth
14   and the language that's in them.  Because the sentence, as
15   the Court just said, cannot be based on outrage at what
16   someone said.
17           And it has to be based on a rational and
18   dispassionate analysis of 3553(a) factors and all the other
19   factors the Court is required to consider.
20           So, the question -- and by the way, the reason I'm
21   doing this is because I'm trying to be helpful, I think, and
22   if I'm not, please tell me.
23           But the question, it seems to me, is what's the
24   necessity?  What does this case present as a necessity?
25   What is sufficient, but not greater than necessary to serve
```

1    the purposes of sentencing?

2              Deterrence and rehabilitation have been addressed

3    in both memos, and there seems to be little disagreement

4    about people have to be deterred, he's got to be deterred,

5    he needs treatment.

6              So, rehabilitation and deterrence, both general

7    and specific, we don't have too much disagreement about, but

8    retribution.  That's the difficult one.

9              The parties seem to be in agreement about the

10   other two, but we don't know where we can agree on

11   retribution.

12             And the problem is -- the problem that that

13   presents is that retribution is the most difficult thing to

14   quantify.  How do you put the scales back in balance for

15   society?  How much does he deserve?

16             And the reason that -- another reason that it's so

17   difficult to determine is because if you think about it,

18   retribution -- I'm sorry, rehabilitation and deterrence are

19   forward looking.

20             THE COURT:  Yeah.

21             MR. DONATO:  Retribution is backward looking.  So

22   how to decide?  Well, it requires the Court to consider all

23   of the things that you've heard here today and it requires

24   the Court to have a thoroughgoing understanding of Andrew

25   Wolf, the person he was, including all the whats of this

 1  case, but not limited to those.

 2          One way would be to look to the state

 3  jurisdiction.  If this were prosecuted in state court, would

 4  be what is called in the state guidelines an offense gravity

 5  score of a 9 or a 10.

 6          Each count would be 12 to 24 months.  And if

 7  there's eight of them, it would be, you know, somewhere --

 8          Assuming there's an equal number of aggravating

 9  factors, which is zero here, and an equal number of

10  mitigating factors, which is several, the likely sentence

11  would be somewhere around 12, 13, 14 years.

12          And Pennsylvania, as you know, has indeterminate

13  sentencing.  So, it would be 12 to 24 or 12 -- you know.

14          I argue to you that we ask for 15 years because

15  that's the least we can ask for, but it's more than Andrew

16  Wolf really needs.

17          I argue to you that if you look at this kid's life

18  and what he's been through and what he's done, and the

19  difficulty and loneliness that someone who has this

20  affliction --

21          And I'm calling it an affliction.  I know it's

22  not, but it seems like it has afflicted him.

23          That person is never going to do this again.  If

24  you gave it to him to do over again, and he knew what he was

25  going to do to his parents and his sister and his daughter,

1    that would be enough to deter him.

2              THE COURT:  Mr. Donato, he wrote that he knew it

3    was illegal.  He knew it was illegal.

4              MR. DONATO:  Of course, he knew.  Of course.  I'm

5    not --

6              THE COURT:  Why do I think that would -- tell me

7    how I answer that.  He knew it was illegal.  He said this is

8    -- he said, this is why it's illegal.

9              MR. DONATO:  Yeah.  He knew it was illegal.

10             THE COURT:  It's not like the guys that come

11   before me that you have the privilege of representing that

12   say I never knew.  I don't know.  My grandson got these

13   pictures.  I have no idea.

14             MR. DONATO:  Well, Your Honor, I'm not suggesting

15   he didn't know it was illegal.

16             THE COURT:  Okay.

17             MR. DONATO:  I'm suggesting that if he knew while

18   he was doing it.  This is the principle of deterrence,

19   right?  And we can argue about whether any --

20             THE COURT:  And he did know when he was getting

21   them.  He knew what he was getting was illegal

22             MR. DONATO:  If he knew that he was going to get

23   arrested, that he was going to have to hire a lawyer, that

24   he was going to be served --

25             THE COURT:  Are you suggesting he didn't?

```
 1            MR. DONATO:  I don't think anybody appreciates all

 2   of the consequences of their actions when they're doing

 3   this.  Because, first of all, they don't think they're going

 4   to get caught, right?

 5            Nobody's going to go rob a bank and say, I'm going

 6   to rob a bank because someone else got five years, so I can

 7   do five years.

 8            THE COURT:  So, it gets so brazen that the emails

 9   are sent to a Springside Chestnut Hill email.

10            MR. DONATO:  Yeah.

11            THE COURT:  Is that just reckless or is that I

12   want to get caught?

13            MR. DONATO:  That's a very interesting question,

14   and with your permission, I'll address it.

15            THE COURT:  Please.

16            MR. DONATO:  I wonder -- I've been doing this for

17   43 years and I wonder all the time why somebody would do

18   something.  And I mean, it just has always confounded me.

19   Before I became a lawyer, I never knew that there was any of

20   this ugliness in the world.

21            My concern is that Andrew Wolf, because he was gay

22   in a situation where it was difficult --

23            THE COURT:  Right.

24            MR. DONATO:  -- I'm concerned that he started to

25   hate himself and did things that were self-destructive --
```

1          THE COURT:  Okay.

2          MR. DONATO:  -- because he just wasn't happy with

3    who he was.  Now, I'm a lawyer, not a psychologist.

4          THE COURT:  No.

5          MR. DONATO:  Just answering the best I can.

6    That's my read on it.  And I'll close with this unless the

7    Court has any other --

8          THE COURT:  No.  No.

9          MR. DONATO:  -- questions.  There are many aspects

10   of this.  Regardless of how many years Andrew Wolf gets,

11   they're a life sentence.

12         He'll be a convicted sex offender for the rest of

13   his life.  He'll be on supervised release for the bulk of,

14   if not the rest of his life.

15         And everyone will know it.  Every potential

16   employer, all of his friends, all of his family members.

17   His daughter will know it.  His community.  He'll live with

18   this guilt for the rest of his life.

19         He will tell you this, but I'll give you a

20   preview.  When we went over the victim impact with him, he

21   wept.  He's going to have to live with that for the rest of

22   his life.

23         That kids that he knew had their lives materially

24   altered in a very unfavorable way.  He's going to have to

25   live with that.

1          Your Honor, we don't come here and say this isn't

2   a bad offense.  We don't come here and say that -- you know,

3   anything about the alleged victims or the damage that Andrew

4   Wolf caused.

5          Life sentences are given out, you know, crimes are

6   graded and crimes are of different gradation.  And we submit

7   to you that because of who he is and because of all the

8   other factors that we've brought to the Court's attention,

9   the Court should impose the 15-year mandatory minimum and

10  nothing more.

11         THE COURT:  Thank you, sir.  Mr. Wolf, you have

12  the right of the United States Constitution to -- and

13  Congress to present any statement you wish to present to me

14  in mitigation or anything you wish to say to me for me to

15  consider.

16         I assure you, Mr. Wolf, as I told you at the plea,

17  I don't know a judge who makes up their mind before they

18  walk into the room, nor have I made up my mind as yet.  I

19  want to hear from you.  I've heard from very talented

20  lawyers on all sides, but I want to hear from you.

21         Do you wish -- you don't have to, though.  Do you

22  wish to present -- do you wish to say anything to me?

23         THE DEFENDANT:  Yes, I do.

24         THE COURT:  All right.  You may do so.  You may

25  sit or stand as you feel comfortable.

1        THE DEFENDANT:  I prepared something to say and

2   wrote this weeks ago, but as Mr. Donato just said, I haven't

3   gotten an opportunity to read the victim impact statements

4   except for one excerpt that was in the pre-sentencing

5   report.

6        THE COURT:  Okay.

7        THE DEFENDANT:  And of course --

8        THE COURT:  I misunderstood.  I thought you had.

9   Okay.

10        THE DEFENDANT:  And then, of course, I heard what

11   was said today.  And so, based on that, I'm probably going

12   to have to add a little bit from what I prepared.

13        THE COURT:  Please.

14        THE DEFENDANT:  I'd say even up until recently, I

15   was still thinking about coming into this day, well, with a

16   lot of different things in my mind and a lot of different

17   feelings, of course, but one of which was, you know, hoping

18   for the minimum possible sentence both for myself and for

19   the impact that it has on my loved ones.

20        But after hearing what Diana shared today, that

21   broke me.  I thought I'd already come to understand over

22   these 16 months more deeply the consequences of my actions,

23   but that drives it home and I will think about that every

24   day for the rest of life.

25        The parents that knew me as their son's teacher

1    knew me to be a very caring person for them, and that wasn't

2    fake.  I cared.  I cared deeply for their wellbeing, and to

3    hear the impact this had, at least on your son, hurting

4    himself, wanting to kill himself, and the impact on your

5    family.

6              I never dreamed --

7              UNIDENTIFIED:  Address her.

8              THE COURT:  I'm okay.  If you want to talk to the

9    -- you may turn as long as you can all see.  I'm fine.

10   Thank you though, Officer.

11             THE DEFENDANT:  I never dreamed that my actions

12   would have this impact.  I know there's very little or

13   nothing I can say to make any of you feel any better, but I

14   still want to apologize very deeply.

15             THE COURT:  Sir, it's creating an issue.  Yeah.

16   Why don't you turn and address me, sir?

17             THE DEFENDANT:  Okay.

18             THE COURT:  I appreciate what you're trying to do,

19   but it's -- you're creating -- it's -- you're creating --

20   speak to me, they'll hear you.

21             THE DEFENDANT:  Okay.

22             THE COURT:  Thank you, sir.  I'm mindful of what

23   you're trying to do, though.

24             THE DEFENDANT:  I want to apologize to the victims

25   of my crimes.  What I did was so deeply wrong on so many

1  levels.

2          I'm sorry for all the damage I caused all of you,

3  from embarrassment to fear and long-term consequences,

4  including not feeling like you can trust people.

5          And what I heard today about not being able to

6  return to the school and every time entering the school,

7  that's what you will think about.

8          And to the families and parents, watching your

9  child go through this ordeal when all you want to do is

10  protect them from harm.

11          To my colleagues and the whole SCH community, I'm

12  so sorry for my actions and the betrayal I inflicted on

13  everyone.  So many of you supported me in my career, and I

14  feel like I took that all for granted and destroyed all the

15  good work I did over almost two decades of teaching.

16          The most important part of my job is to protect

17  children.  I did the complete opposite.

18          To my family and my loved ones, my friends, even

19  with all of you that are standing by me through all of this,

20  I know I've done damage to our relationships, some of which

21  might not ever be able to be repaired.

22          And I know you have a range of feelings,

23  confusion, disappointment, anger.

24          Mom and dad, you were and still are the best

25  parents I could imagine having and I repaid you my horrible

1    actions and broke your hearts.  I want you to know, you did

2    nothing wrong in raising me.  This is all on me.

3              To my daughters, it's hard to find the words.  I

4    ache all day knowing I'm not there with you, for you, right

5    now.  I failed as a father with the most important

6    responsibility, simply being there.  I'm so sorry for this

7    and will be every day for the rest of my life.  I miss you

8    and love you so much.

9              How could I have committed these crimes?  It's the

10   question I ask myself countless times every day, a question

11   that keeps me up at night.  Was it an addiction?  I'm

12   working with Dr. Atkins to figure it out.

13             One thing I know right now is that I let things

14   spiral.  I was selfish.  I was so selfish and so stupid.  I

15   don't know why, but I did not picture the consequences of my

16   actions.

17             And I don't mean my punishment.  I mean affecting

18   the lives of these children and their families and my

19   family.

20             I know I would never do anything like this again.

21   My whole life I've strived to do the right thing.  I had

22   strived to do the right thing.  I hate to see people hurting

23   for any reason.

24             I put blinders on and made unspeakable decisions.

25   I made the most regretful decisions in my life and it

1   disgusts me every time I think about it.

2          I'm ready to accept my consequences and I know

3   that many of the consequences that blowing up my life has

4   caused will be with me forever, ruining my career, ruining

5   relationships, all the lost time with loved ones.

6          But if I'm fortunate enough, I do look forward to

7   rejoining with my family someday and finding some way to

8   give back to society from all that I've taken.

9          THE COURT:  Anything further, Mr. Wolf?

10         THE DEFENDANT:  No.

11         THE COURT:  Mr. Donato?

12         MR. DONATO:  Nothing further, Your Honor.

13         (Designated portion concluded at 2:01 p.m.)

14                       *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T I O N**

2              I, Valori Weber, court approved transcriber,

3    certify that the foregoing is a correct transcript from

4    the official electronic sound recording of the

5    proceedings in the above-entitled matter, and to the best

6    of my ability.

7

8       /s/ *Valori Weber*

9    Valori Weber

10

11   Dated:   July 9, 2023

12

13

14

15

16

17

18

19

20

21

22

23

24

25